AUSA MARK E. SCHNEIDER    (312) 353-5356
AUSA JACQUELINE STERN     (312) 353-5329
AUSA SHERI H. MECKLENBURG  (312) 469-6030

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

JOSE EDUARDO SERRANO-ESPINOZA,
   a/k/a "Gato," a/k/a "Negro"
ROGELIO SOBERANIS,
ROSALIO SOBERANIS,
   a/k/a "Chalillo,"
MARIANO LOPEZ,
ROBERTO CARLOS SILVA LOPEZ,
   a/k/a "Shorty,"
HECTOR URBINA,
   a/k/a "Papa Noa," a/k/a "Toro,"
   a/k/a "Roman," and
REUBEN ROMO, a/k/a "Papa," a/k/a "Joe,"
   a/k/a "David"

CASE NUMBER: **MAGISTRATE JUDGE KEYS**

**08CR      241**

**FILED**

MAR 2 4 2008
MAR 2 4 2008
**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

I, ERIKA GENNUSO, the undersigned complainant, being duly sworn, state the following

is true and correct to the best of my knowledge and belief.  Beginning not later than in or

about 2006 and continuing through the present, in Cook County, in the Northern District of

Illinois, Eastern Division, and elsewhere, defendants did

conspire with each other and with others to possess with intent to distribute and
to distribute a controlled substance, namely, in excess of five hundred grams of
mixtures and substances containing cocaine, mixture and substances containing
heroin, and marijuana, in violation of Title 21, United States Code, Section
841(a)(1);

in violation of Title 21, United States Code, Section 846, and Title 18, United States Code,
Section 2.  I further state that I am a Special Agent, Federal Bureau of Investigation, and
that this Complaint is based on the following facts:

**See Attached Affidavit.**

Continued on the attached sheet and made a part hereof:  _X_ Yes  ___ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

March 24, 2008                              at     Chicago, Illinois
Date                                               City and State

ARLANDER KEYS, U.S. Magistrate Judge
Name & Title of Judicial Officer                   Signature of Judicial Officer

STATE OF ILLINOIS )
                )
COUNTY OF COOK )

## AFFIDAVIT

I Erika Gennuso, being first duly sworn on oath, depose and state as follows:

## I.  PRELIMINARY MATTERS

1.    I am a Special Agent of the Federal Bureau of Investigation ("FBI").  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to investigate and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  As such, I am "an investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510.

2.    The purpose of this affidavit is to establish probable cause in support of (1)  an application for search warrant for the premises identified herein and (2) a criminal complaint charging the following persons with conspiracy to possess with intent to distribute and to distribute controlled substances, namely, cocaine, heroin, and marijuana, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2:

      a.    JOSE EDUARDO SERRANO-ESPINOZA, also known as ("a/k/a") Oscar Aguirre, a/k/a Gato, a/k/a Negro;

      b.    ROGELIO SOBERANIS;

      c.    ROSALIO SOBERANIS, a/k/a Chalillo;

      d.    MARIANO LOPEZ, a/k/a Jose Leyua Barrera, a/k/a Luis Mariano Valera;

      e.    ROBERTO CARLOS SILVA LOPEZ, a/k/a Shorty;

      f.    HECTOR URBINA, a/k/a Hector Sanchez, a/k/a Hector Barrietos, a/k/a Papa

1

Noa, a/k/a Toro, a/k/a Roman; and

g.    REUBEN ROMO, a/k/a Papa, a/k/a Joe, a/k/a David.

3.    I have been employed as a Special Agent by the FBI for more than three and a half years. I am currently assigned to the Chicago Field Division and to a squad assigned to identify, disrupt, and dismantle Colombian and Mexican drug trafficking organizations operating in the Chicago, Illinois area. I am responsible for investigating crimes that involve the unlawful importation and exportation of illegal narcotics, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, as well as the related laundering of monetary instruments, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952(a), 960 and 963, and Title 18, United States Code, Sections 1956 and 1957, respectively. In conducting these investigations, I have used a variety of investigative techniques and resources, which have included physical and electronic surveillance, monitoring court-authorized wiretaps, managing the use of cooperating witnesses ("CWs") and informants, and securing other relevant information using other investigative techniques. Through these investigations, my training and experience, and conversations with other Special Agents as well as other law enforcement personnel, I have become familiar with methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, to collect and launder related narcotic proceeds, and otherwise to conduct their drug-related business. These include, but are not limited to, the use of both prepaid cellular and cellular phones, as well as normal land line phones, public phones, debit calling cards, counter-surveillance, the use of false and/or fictitious identities, and the use of coded language during conversations when referring to narcotics in an attempt to disguise the true meaning of the conversation.

2

4.      The investigation described in this affidavit has involved at various points special agents and task force officers (collectively, "agents") of the FBI and Drug Enforcement Administration ("DEA") as well as the Chicago Police Department ("CPD"). This affidavit is based upon not only my own investigation but also information provided to me by other agents and law enforcement officials, including the result of searches, seizures, and surveillance; analysis of telephone toll records and pen register information; information gathered from persons cooperating with the investigation; review of consensual-recorded conversations; review of conversations intercepted pursuant to Court orders authorizing the interception of wire communications; and the knowledge, training and experience of myself and other agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the individuals identified above, and to search the premises described herein, I have not included each and every fact known to me concerning this investigation.

## II.     OVERVIEW OF THE CONSPIRACY

5.      Beginning in 2006, the FBI and DEA began conducting an investigation concerning the drug trafficking and related activities of ROGELIO SOBERANIS ("ROGELIO"), HECTOR URBINA ("URBINA") and other individuals working with and on behalf of ROGELIO and URBINA, including drug suppliers, distributors, and customers. The investigation was initiated based on information provided by a DEA Confidential Source ("CS-1") and an FBI Cooperating Witness ("CW-3"). The investigation revealed that ROGELIO and URBINA are part of a drug trafficking organization operating in Chicago that distributes multi-kilogram quantities of cocaine, pounds of marijuana, and quantities of heroin throughout the Chicago area (the "organization"). This investigation also revealed that ROGELIO either received or attempted to obtain cocaine, heroin,

3

and marijuana from multiple suppliers, including MARIANO LOPEZ ("LOPEZ"), ROSALIO

SOBERANIS ("ROSALIO"), and JOSE EDUARDO SERRANO-ESPINOZA ("SERRANO").

ROGELIO communicates with these suppliers by telephone and in person to coordinate deliveries

of cocaine, heroin, marijuana, and drug proceeds.  ROGELIO purchases and then distributes or

attempts to distribute this cocaine, heroin, and marijuana to other members of the conspiracy,

including REUBEN ROMO ("ROMO"), ROBERTO SILVA ("SILVA"), URBINA and others who

in turn distribute the narcotics to their customers.

6.    This investigation has revealed the following about the roles of the individuals in the

drug trafficking organization:

### Organizers/Leaders

a.    JOSE EDUARDO SERRANO-ESPINOZA, a/k/a Oscar Aguirre, a/k/a Gato

a/k/a Negro ("**SERRANO**"), is a member of the drug trafficking organization which at one time

supplied ROGELIO.[1]  Also, SERRANO had persuaded CW-3 to repay money that CW-3 owed to

the organization for two kilograms of cocaine.  Soon thereafter, CW-3, under FBI supervision, paid

SERRANO a $5,000 payment toward that debt.  See paragraphs: 23-41 and 60-74.

b.    ROGELIO SOBERANIS ("**ROGELIO**") is an organizer and leader of a

Chicago-area cell of the drug trafficking organization who received, or attempted to obtain,

quantities of cocaine from various suppliers, to include SERRANO, LOPEZ, SILVA, and URBINA,

---

[1]During the investigation, SERRANO was identified by CW-3 when CW-3 met SERRANO face-to-face on December 7, 2007 and CW-3, under the direction of the FBI, purchased one kilogram of cocaine from SERRANO and ROGELIO.  In addition, SERRANO was identified by surveillance by agents, by Chicago Police Department officers who stopped and identified SERRANO from a Mexican identification card, by first name and nicknames during intercepted telephone calls, and by a consensually recorded telephone call between SERRANO and CW-3.

then distributed these quantities of cocaine to members of the conspiracy and others.[2] From on or about December 28, 2006 through on or about January 25, 2007, a telephone used by ROGELIO (**Target Phone 2**) was the subject of Court-authorized wiretap. From on or about February 6, 2007 through on or about March 6, 2007, another telephone used by ROGELIO (**Target Phone 3**) was also the subject of Court-authorized wiretap. See paragraphs: 53-199.

      c.    ROSALIO SOBERANIS, a/k/a Chalio ("**ROSALIO**"), is the older brother of ROGELIO and assists ROGELIO with certain aspects of the narcotics business, such as collecting money owed to the organization from CW-3, offering to distribute cocaine to customers, including CW-3, and making efforts to determine if vehicles identified by members of the organization are associated with law enforcement.[3] See paragraphs: 124-133, 143-152, and 191.

### Workers/Other Suppliers

      d.    MARIANO LOPEZ a/k/a Jose Leyua Barrera a/k/a Luis Mariano Valera ("**LOPEZ**") is a worker for the organization who had distributed kilogram quantities of cocaine to customers, including CW-3. LOPEZ also has contact with other suppliers who are believed to be separate from the SOBERANIS organization and attempted to arrange that quantities of heroin be

---

[2] During the investigation, CW-3 identified ROGELIO when CW-3 and ROGELIO met in person on December 7, 2007 and CW-3, under the direction of agents, purchased one kilogram of cocaine from SERRANO and ROGELIO. ROGELIO was also observed on surveillance by agents and identified himself during intercepted calls and consensually recorded telephone calls between himself and CW-3.

[3] During the investigation, ROSALIO was identified by CW-3 when ROSALIO met with CW-3 to discuss money CW-3 owed to the organization and to collect a $5,000 payment that CW-3, under FBI supervision, made to ROSALIO. In addition, ROSALIO was identified by surveillance agents based upon an Illinois driver's license photograph and from Illinois Secretary of State vehicle registration records. He was also identified by nickname during intercepted telephone calls and identified himself by first name to CW-3 in a consensually recorded telephone call.

obtained for distribution to members of the conspiracy and others.[4] See paragraphs: 75-95, 153-191.

      e.     ROBERTO CARLOS SILVA LOPEZ a/k/a Shorty ("**SILVA**") is a worker

for the organization who had distributed kilogram quantities of cocaine to customers, including CW-

3. SILVA also has contact with other suppliers presently thought to be separate from the

SOBERANIS organization and attempted to arrange that multiple kilogram quantities of cocaine be

obtained for distribution to members of the conspiracy and others.[5] See paragraphs: 43-52, 56-59,

75-95, and 134-142.

### Others

      f.     HECTOR URBINA a/k/a PAPA NOA a/k/a TORO a/k/a ROMAN

("**URBINA**") is a customer of the organization who purchased wholesale quantities of cocaine from

ROGELIO and distributed this cocaine to other customers. URBINA also has either sold quantities

of cocaine to ROGELIO or made attempts to purchase kilogram quantities of cocaine from others

and sell this cocaine to ROGELIO for distribution to other members of the conspiracy.[6] See

paragraphs: 15-20, 75-123, 153-191.

      g.     RUEBEN ROMO a/k/a Papa a/k/a Joe a/k/a David ("**ROMO**") is a customer

who purchased, or made attempts to purchase, quantities of cocaine from ROGELIO and distributed,

---

[4]During the investigation, LOPEZ was identified by agents and CW-3 from an arrest photograph, observed on surveillance by agents, and self-identified during an intercepted call.

[5]During the investigation, SILVA was identified by a DEA Task Force Officer when SILVA was stopped and provided the officer with a Mexican identification card, and was observed on surveillance by agents.

[6]During the investigation, URBINA was identified by a Chicago Police Department officer when URBINA was stopped and provided a Mexican identification card to the officer, and observed on surveillance by agents.

or attempted to distribute this cocaine to ROMO's customers.[7] Also, ROMO has assisted the organization by portraying himself as a leader or supplier of the organization and meeting with CW-3 to press CW-3 to repay money that CW-3 owed for two kilograms of cocaine. See paragraphs: 60-74.

## III.    BACKGROUND AND PRELIMINARY INVESTIGATION

### A.    Cooperating Persons

#### 1.    DEA CS-1

7.    CS-1 is a confidential source for the DEA and has been confidential informant for the CPD since approximately spring 2004. CS-1 became a DEA CS in approximately March 2005 but was deactivated in early 2006 after being arrested by CPD for possession of cannabis. The case was dismissed by the Cook County State's Attorney's office based on cooperation with the DEA. CS-1 also has a prior arrest for Possession of a Controlled Substance; the case was nolle prosequi in state court. CS-1 has been paid for his/her cooperation in the past, is cooperating for the purpose of receiving financial remuneration, and has been paid in excess of approximately $17,750, according to a DEA handling agent. In connection with the investigation of URBINA, CS-1 has been providing information to the government from approximately July 2006 until the present. The information provided by CS-1 has been corroborated in significant respects by another confidential source, physical surveillance, consensually-recorded conversations, and analyses of telephone toll, pen register and trap and trace information.[8]

---

[7]During the investigation, ROMO was identified by surveillance agents based upon an Illinois driver's license photograph and public source records. He was further identified by nickname during intercepted calls.

[8]    On December 8, 2006, at approximately 6:45 p.m., CW-3 (as identified *infra*) contacted an FBI agent and told the agent that CW-3 had just had an unplanned meeting with CS-1.

7

### 2.    DEA CS-2

8.    CS-2 has been a DEA CS since on or about May 4, 2006.  In 2003, CS-2 was charged

with possession of marijuana in excess of 2,000 pounds  CS-2 was acquitted of the charge.  In

consideration for his cooperation in DEA investigations, CS-2 was paid in excess of approximately

$30,000 in 2006 and was cooperating for the purpose of receiving remuneration.  CS-2 has been

deemed reliable by the DEA in that the CS-2 has provided information that resulted in two separate

large seizures of narcotics.  The information that CS-2 provided with respect to URBINA has been

corroborated by confidential source, physical surveillance, an overheard conversation, and analysis

of telephone records.

### 3.    FBI CW-3

9.    CW-3 is a cooperating witness for the Chicago Office of the FBI.  In or about

---

Specifically, CW-3 told the agent that while at a grocery store CW-3 met with an individual, that
the individual offered to sell CW-3 cocaine, and provided the agent with this individual's cellular
telephone number.  Based on the individual's name and telephone number, an FBI agent
determined this individual to be CS-1.  (FBI agents have not told FBI CW-3 that DEA CS-1 is
cooperating and likewise, DEA agents have not told DEA CS-1 that FBI CW-3 is cooperating.)
According to CW-3, CW-3 has known DEA CS-1 for approximately seven to eight years, knows
CS-1 is involved with drug trafficking, but has never engaged in any drug transaction with CS-1.
During this meeting, according to CW-3, CW-3 asked if CS-1 had anything going on and CS-1
responded that CS-1 had coke which CW-3 understood to mean cocaine, that CS-1's people just
got in 500 kilograms, and quoted prices to CW-3 as being $17,500 per kilogram and $9,000 for a
½ kilogram.
        On December 10, 2006, an FBI agent contacted a DEA agent who is one of the handling
agents for CS-1.  The FBI agent advised the DEA agent of the unplanned meeting between FBI
CW-3 and DEA CS-1.
        On December 11, 2006, a DEA agent contacted CS-1 and asked if anything was new and
if CS-1 had talked to anyone.  In response CS-1 told the TFO's that nothing had occurred.
        On this same date, approximately 20 minutes later, CS-1 contacted the agent and told
them that CS-1 had met with CW-3.  CS-1 explained that CW-3 is someone that CS-1 knows and
knows that CW-3 is involved with drug trafficking.  According to CS-1, CW-3 asked if CS-1 had
any cocaine and CS-1 told CW-3 that CS-1 did not have any cocaine and provided CW-3 with
CS-1's cellular telephone number.

November 2006, CPD began investigating the narcotics trafficking activities of CW-3 based upon information they were obtaining from a CPD Confidential Informant. In November 2006, CPD officers executed a search warrant at CW-3's residence and seized approximately 144 grams of powder cocaine, $33,000 in United States Currency (USC), and a firearm. CW-3 was arrested for possession of a controlled substance and possession of a firearm. The following day, after CW-3 was released on bond, CW-3 telephonically contacted an FBI agent and advised the agent that he/she was willing to provide information about narcotics trafficking information to the FBI. CW-3 was cooperating with the FBI and CPD in hopes of receiving a reduced sentence for his/her state charge. In or around June 2007, based upon CW-3's cooperation, the charge of possession of a controlled substance was dismissed, CW-3 pleaded guilty to possession of a firearm, and CW-3 was sentenced to probation. The FBI has provided financial assistance to CW-3 to assist CW-3 with relocation for purposes of witnesses safety.

10.     In addition to the charge described above, CW-3 has been arrested. In 1984, CW-3 was arrested by CPD for criminal damage to property. No disposition is listed for this arrest. In 1985, CW-3 was arrested by CPD for murder. No disposition is listed for this arrest. In 1991, CW-3 was arrested by CPD for criminal damage to property and telephone harassment. These charges were dropped. In 1992, CW-3 was arrested by the DEA for conspiracy to distribute cocaine. In 1993, CW-3 was convicted of money laundering and using a firearm during drug trafficking and sentenced to 110 months in federal prison.

**B.     Historical Information and Investigation Prior to Wiretaps**

**1.     CS-1 Reporting on URBINA**

11.     In approximately July of 2006, CS-1 related to agents that CS-1 had been having conversations for approximately one to one-and-a-half years with URBINA in which URBINA

requested CS-1's assistance in transporting multiple kilograms of cocaine from Houston or Dallas,

Texas to the Chicago-land area. URBINA also asked CS-1 if CS-1 was interested in going to

Mexico and meeting with URBINA's co-conspirators for the purpose of transporting multiple

kilograms of cocaine from Mexico to the Chicago-land area. CS-1 had been telling URBINA that

he/she was not interested in traveling to Mexico. These conversations were not recorded.

### 2.    URBINA Recruits CS-2 as Drug Transporter

12.    In July 2006, DEA agents directed CS-1 to tell URBINA that CS-1 knew somebody

who was a truck driver who was willing to go to Texas and pick up multiple kilograms of cocaine

and return them to Chicago. According to CS-1, CS-1 contacted URBINA and informed him that

he/she knew of a truck driver willing to transport cocaine to Chicago. This conversation was not

recorded.

13.    On or about August 4, 2006, CS-1 introduced CS-2 to URBINA as the truck driver

described in the above paragraph. This meeting was surveilled. CS-2 was fitted with a recording

device and transmitter; however, the recording device malfunctioned and no recording was made.

Agents observed URBINA arrive in a red Chevy Blazer (Illinois temporary registration 466G476,

registered to Individual 1, 3117 N. Lawndale, Chicago, Illinois).[9] CS-1, CS-2, and URBINA were

observed meeting on the street outside of URBINA's car. After making the introduction, CS-1 left

the meeting. URBINA then entered CS-2's vehicle. An experienced Spanish-speaking agent familiar

with the context of the investigation overhead the conversation (which was in Spanish) via the

transmitter. According to the Spanish-speaking agent, the conversation covered the following topics

---

[9]Shortly before a meeting between CS-1 and URBINA on July 26, 2006, when URBINA
provided a sample of cocaine to CS-1, agents observed URBINA speaking with a Hispanic male.
Based on a Chicago Police Department arrest photograph, that male matches the description of a
Individual 1.

after CS-1 departed:

        (a)     URBINA and CS-2 discussed the possibility of CS-2 traveling to Houston, Texas and picking up multiple kilograms of cocaine and delivering the cocaine back to Chicago. URBINA also asked CS-2 if CS-2 was willing to bring one ton of marijuana from Texas to Chicago. URBINA told CS-2 that the contact in Texas would be URBINA's brother. URBINA also asked CS-2 if CS-2 was willing to travel to Mexico and transport an amount of cocaine back to Chicago. CS-2 declined. URBINA told CS-2 that his narcotics pipeline is from Mexico to Texas to Chicago to South Carolina and Florida. URBINA also told CS-2 that he had 500 kilograms of cocaine and 7 kilograms of heroin in California and asked CS-2 if CS-2 was willing to transport it back to Chicago. URBINA told CS-2 that he would supply the equipment to make the delivery.

        (b)     URBINA and CS-2 discussed the amount of money that CS-2 could be paid for transporting the narcotics, but URBINA told CS-2 that URBINA's brother in Texas would have to finalize the amount that CS-2 would be paid.

        (c)     URBINA also gave CS-2 his phone number (773) 331-1689 (Target Phone 1) at this meeting.

    14.    Shortly after the conversation, agents directed CS-2 to travel to Texas and to attempt to meet URBINA's brother. At times between August 4 and August 16, 2006, CS-2 reported to agents via telephone that he/she had traveled to Texas to meet with URBINA's brother as directed. CS-2 reported that once in Texas he/she spoke by telephone with URBINA (on Target Phone 1) who informed CS-2 that the brother was not available. The meeting therefore did not take place. Telephone toll records show that there were six phone calls between CS-2's telephone and Target Phone 1 between August 5, 2006, and August 16, 2006.

    **c.**    **URBINA Distributes Cocaine to CS-1**

15.     On or about July 26, 2006, CS-1 informed agents that URBINA had called CS-1 earlier in the day and asked CS-1 if CS-1 was interested in purchasing 4 ½ ounces of powder cocaine. This call was not recorded. Agents instructed CS-1 to call URBINA back.

16.     On or about July 26, 2006, under the direction of law enforcement, CS-1 made a consensually recorded telephone call to URBINA at **Target Phone 1**.[10] During this conversation, which occurred in Spanish, CS-1 asked URBINA "Are you ready?" and URBINA responded, "I'll get to the house right now." URBINA instructed CS-1 to meet him at his residence and CS-1 stated that CS-1 would pick up URBINA at his residence. URBINA then asked CS-1 "…you got the papers [United States Currency] already?" and CS-1 said yes.

17.     On or about July 26, 2006, CS-1 met with URBINA in CS-1's vehicle. The meeting was surveilled and recorded. Before the meeting, CS-1 and CS-1's vehicle were searched for contraband, drugs, and cash, and none was discovered. Prior to the meeting, agents established surveillance at URBINA's residence, 3117 North Lawndale Avenue, Chicago, Illinois. Agents observed two unknown Hispanic males exit the residence, enter a green Monte Carlo, Illinois plate number 3637629, and depart. As set forth below, this vehicle was later observed to be driven by SILVA. CS-1 arrived at URBINA's residence and agents observed URBINA enter CS-1's vehicle. According to CS-1, who was debriefed afterwards, URBINA questioned CS-1 about vehicles that

---

[10]Unless otherwise noted, the consensually recorded telephone calls or in-person meetings by CS-1 and CS-2 as set forth in this affidavit are in Spanish and the recorded conversations were reviewed by either a Spanish-speaking DEA agent or DEA contract employee. The summaries of these recorded conversations are based on a review of these recordings and/or draft, not final, transcripts. The summaries do not include all of the topics discussed during the conversations. During the recitation of calls or in-person meetings, I have placed in brackets my understanding of the conversation which is based on CS-1 and/or CS-2's understanding of the conversation, my understanding of the conversation or code word used, and/or the context and content of the entire conversation and the investigation as a whole.

were in the immediate area.  URBINA directed CS-1 to drive around the block to determine whether he would be followed.  Surveillance observed CS-1 drive around the block.  After driving around the block, CS-1 parked and URBINA exited CS-1's vehicle and was observed entering 3117 North Lawndale Avenue.  CS-1 called agents and reported that URBINA had been looking at vehicles. Thereafter surveillance observed URBINA return to CS-1's vehicle and approach the driver's side of CS-1's vehicle.  According to CS-1, URBINA placed a clear knotted piece of plastic containing white powder into the shirt pocket of CS-1.  CS-1 drove away and met with agents, who recovered a knotted piece of clear plastic containing a white powder from CS-1's shirt pocket.  The white powder was subsequently tested and determined to contain .9 grams of mixtures and substances containing cocaine.

### d.     URBINA Offers to Sell Kilogram of Cocaine to CS-1

18.     On or about July 28, 2006, under the direction of agents, CS-1 made a telephone call to **Target Phone 1** and asked URBINA if URBINA would sell CS-1 "three," meaning three kilograms of cocaine.  URBINA told CS-1 that he had one for seventeen, which CS-1 understood to be one kilogram of cocaine for $17,000.  URBINA also said that if CS-1 needed two more, URBINA would have to get them from someone else and the price for each would be five hundred more.  CS-1 understood URBINA to mean that if CS-1 wanted an additional two kilograms of cocaine, they would cost $17,500 per kilogram.  This conversation took place in the Spanish language and was recorded but was inadvertently erased before any copies could be made.  However, a Spanish-speaking agent overheard both sides of the conversation.  This cocaine transaction never occurred.

### e.     Attempted Purchase of Cocaine from URBINA

19.     On or about December 5, 2006 and as directed by DEA agents,  CS-1 and an

13

Undercover Police Officer ("U/C") attempted to purchase a half kilogram of cocaine from URBINA. CS-1 made two consensually recorded telephone calls to **Target Phone 1** and each time the calls went to voice mail. URBINA telephoned CS-1 back and CS-1 did not answer. At approximately 12:17 p.m., CS-1 made a consensually recorded call to **Target Phone 1** and URBINA told CS-1 that he was working until 3:00 p.m. and would not be able to meet CS-1 until that time. According to pen register records, three minutes later at 12:20 p.m. URBINA made an outgoing call to (773) 387-6368 **(Rogelio Phone A)**. **Rogelio Phone A** was, at the time, a telephone number being used by ROGELIO. CS-1 made two consensually recorded calls to **Target Phone 1** and each time the calls went to voice mail. At approximately 2:42 p.m., CS-1 made a consensually recorded call to **Target Phone 1** again and URBINA told CS-1 that he was on his way home and he would call CS-1 when he arrived. Pen register records show that URBINA made an outgoing call to **Rogelio Phone A** at 2:45 p.m. At approximately 3:05 p.m., URBINA made a consensually recorded call to CS-1 and, according to CS-1, told CS-1 that he would meet CS-1 at Diversey Avenue and Lamon Street in Chicago and that he (URBINA) was afraid to meet the U/C because URBINA was worried that the U/C would rob him. Pen register records show that URBINA made an outgoing call to **Rogelio Phone A** at 3:19 p.m.

20. At this time, CS-1 and the U/C were outfitted with transmitting devices for agents to overhear the transaction. CS-1 was also outfitted with a recording device. After approximately twenty minutes, URBINA called CS-1 again and stated that he did not want to meet anyone. CS-1 and the U/C arrived at the meet location and agents observed an unknown Hispanic male arrive in a Ford Probe, Illinois license plate 8059389 and walk South past CS-1 and the U/C. A short time later, URBINA with another unknown male arrived in a gray Acura Legend, Illinois license plate

14

939G016[11]. At this time, agents overheard URBINA speaking to CS-1 and CS-1 state that URBINA

was in a gray car. CS-1 then walked over to the Legend and began a conversation with URBINA.

CS-1 then walked over to the U/C and indicated it [the cocaine] was in the glove compartment. CS-

1 and U/C walked back to the Legend. The U/C asked URBINA, who was in the Legend, to see it

and URBINA indicated he wanted the money first. Since URBINA refused to show the cocaine to

CS-1 and the U/C, CS-1 and the U/C walked away. URBINA then drove away and the unknown

Hispanic male in the Probe also drove away. CS-1 then made a telephone call to Target Phone 1.

This telephone call was not recorded; however, CS-1's portion of the conversation was recorded via

a concealed recording device that CS-1 was wearing. During this call, according to CS-1, URBINA

indicated that he did not want to do the deal on this date.

### f.    Reporting by CW-3 on ROGELIO, MARIANO, SILVA

21.    On or about November 21, 2006, CW-3 provided the following information to the

FBI:[12] An individual known to CW-3 as ROGELIO worked for a drug trafficking organization out

of the Juarez, Mexico area, is a leader of this organization in the Chicago area, and obtains shipments

of cocaine from Mexico ranging from 75 kilograms to 100 kilograms at a time. The approximately

144 grams of powder cocaine seized at CW-3's residence by the CPD during the execution of a

search warrant was a small amount of powder cocaine left over from a larger quantity that CW-3 had

purchased from ROGELIO. CW-3 had been purchasing powder cocaine from ROGELIO for

---

[11]The Acura had Illinois temporary registration number, An NCIC inquiry revealed that this license plate was registered to an individual at 3117 N. Lawndale, Chicago, Illinois.

[12]In this interview, the FBI agent told CW-3 that CW-3 did not have to make any statements to the agent because of CW-3's pending state case. CW-3 advised that CW-3 did not yet have an attorney, was willing to speak with the agent, and cooperate. CW-3 later reported that CW-3 had obtained an attorney and wished to continue cooperation. An agent then spoke with the attorney, who agreed that agents could continue communicating directly with CW-3.

approximately the last year, as often as every week or two, in amounts which normally range from two to four kilograms of cocaine. ROGELIO would often "front" or give CW-3 cocaine on credit because they have a strong, trusted, drug trafficking relationship. ROGELIO's cellular telephone number was (773) 387-6368 (**Rogelio Phone A**).

22.　　On or about November 28, 2006, CW-3 provided the FBI with the following information:[13]

(a)　　Approximately three years ago CW-3 met an individual known to CW-3 only as "Mariano," later identified to be LOPEZ, and began purchasing kilogram quantities of cocaine from him.

(b)　　Approximately six to seven months ago, CW-3 was outside in the rear of his/her residence and was approached in the alleyway by an individual who identified himself as "Shorty," later identified as SILVA. SILVA explained that he was a friend of "Mariano's" (LOPEZ) and provided CW-3 with his (SILVA's) telephone number if CW-3 needed any cocaine. Shortly after meeting SILVA, CW-3 purchased cocaine from LOPEZ and it was poor quality. As a result, CW-3 contacted SILVA and purchased a kilogram of cocaine from SILVA and was impressed with the quality of this cocaine. Shortly thereafter, CW-3 then purchased another kilogram from SILVA. When SILVA arrived at CW-3's residence, he was with ROGELIO and introduced CW-3 to ROGELIO.

(c)　　CW-3 continued to purchase cocaine from SILVA. ROGELIO accompanied SILVA when SILVA delivered the cocaine. During one such transaction, ROGELIO told CW-3 that

---

[13]Agents also had follow-up conversations with CW-3 to elaborate upon and clarify information CW-3 provided on November 28, 2006. Any such clarifications are incorporated into the description of the information CW-3 provided on this date.

the cocaine that both LOPEZ and SILVA were selling to CW-3 was ROGELIO's cocaine.  Shortly

after CW-3 was introduced to ROGELIO, CW-3 began purchasing cocaine directly from ROGELIO.

When CW-3 first started purchasing cocaine from ROGELIO, ROGELIO was accompanied by

SILVA and it was CW-3's understanding that SILVA was getting approximately $200 for each

kilogram that CW-3 bought.  After a few transactions, ROGELIO started showing up to sell cocaine

to CW-3 without SILVA.  When CW-3 asked why SILVA was not there, ROGELIO told CW-3 that

he was doing the transaction without SILVA's knowledge which CW-3 understood to mean that

SILVA was being cut out of his $200 commission.

       (d)     Since approximately six to seven months ago, and up until CW-3's arrest by

CPD in approximately November 2006, CW-3 had been purchasing cocaine from ROGELIO in

amounts that ranged from one to four kilograms approximately every week or every other week.  On

some occasions, CW-3 estimated that CW-3 purchased as much as 30 kilograms of cocaine a month

from ROGELIO.  CW-3 explained that, if CW-3 desired, ROGELIO would often provide CW-3

kilograms of cocaine on credit equal to what CW-3 was purchasing.

       (e)     ROGELIO was selling the kilograms of cocaine to CW-3 for approximately

$17,500 apiece.  However, during the last several transactions, CW-3 had been paying ROGELIO

$18,500 for each kilogram because, in approximately July 2006, one of CW-3's customers,

INDIVIDUAL A, purchased two kilograms of cocaine from CW-3 and only paid CW-3

approximately $8,000.  As a result, CW-3 had been paying an additional $1,000 for each kilogram

to repay this debt to ROGELIO.  CW-3 estimated that he/she still owed ROGELIO approximately

$20,000 for the cocaine that CW-3 sold to INDIVIDUAL A.

       (f)     The cocaine transactions between ROGELIO and CW-3 occurred in the same

17

general fashion. ROGELIO would normally personally transport the cocaine in a white-colored sedan to CW-3's garage and park outside in the alleyway. CW-3 has seen ROGELIO touch an area on the car's dashboard area causing a secret compartment underneath the rear seat to open. CW-3 has seen ROGELIO reach into the secret compartment, retrieve the cocaine, put the cocaine in his jacket or clothing where it would be concealed from view, and walk into CW-3's garage where they conducted the transaction. CW-3 handed money to ROGELIO while ROGELIO handed the cocaine to CW-3. While ROGELIO would count, or flip through the money, CW-3 would cut a "v" shaped cut into the cocaine to inspect it. After CW-3 was satisfied with the cocaine and ROGELIO was satisfied with the money, ROGELIO would exit the garage with the money, enter his vehicle, and depart the area.

### g.    ROGELIO & SERRANO Sell Kilogram of Cocaine to CW-3

23.    On or about November 22, 2006, according to CW-3, ROGELIO used **Rogelio Phone A** to call CW-3. This call was not recorded. During this call, ROGELIO told CW-3 that the "family" [shipment of cocaine] was in town. In response, CW-3 told ROGELIO that CW-3 would talk to ROGELIO sometime after the Thanksgiving holiday. Toll records obtained for **Rogelio Phone A** indicate that on November 22, 2006, at approximately 1:03 p.m., a call was made from **Rogelio Phone A** to CW-3's cellular telephone and that the call lasted one minute. These toll records also show that on this same date, at approximately 3:57 p.m., CW-3's cellular telephone was used to contact **Rogelio Phone A** and that call also lasted for one minute.

24.    On or about November 26, 2006, according to CW-3, ROGELIO used **Rogelio Phone A** to call CW-3. This call was not recorded. According to CW-3, ROGELIO told CW-3 that the "family" [shipment of cocaine] was all gone except for "one" [kilogram of cocaine] and that

18

ROGELIO would save that "one" [kilogram of cocaine] for CW-3 for two days.

25.    On November 28, 2006, at approximately 8:05 p.m., CW-3 placed a consensually recorded telephone call to ROGELIO[14] on **Rogelio Phone A**. During this call, CW-3 asked if ROGELIO "Let go of that family" [shipment or kilograms of cocaine]. ROGELIO responded that "More family [kilograms of cocaine] arrived." CW-3 told ROGELIO that they (CW-3) were waiting for people and would want "two." [kilograms of cocaine] ROGELIO responded to CW-3 "Ok."

26.    On December 4, 2006, according to CW-3, SILVA called CW-3 from telephone number (773) 701-8766. This call was not recorded. During this call, SILVA asked CW-3 why CW-3 had not called ROGELIO and asked if everything was alright. CW-3 told SILVA that CW-3 would call ROGELIO soon.

27.    On December 6, 2006, at approximately 1:30 p.m., according to CW-3, ROGELIO used **Rogelio Phone A** to call CW-3. This call was not recorded. During this call, ROGELIO asked CW-3 if CW-3 was "ready". CW-3 told ROGELIO that they were busy, couldn't talk at that time, and would call ROGELIO back later.

28.    On December 6, 2006, at approximately 4:48 p.m., CW-3 placed a consensually recorded telephone call to ROGELIO on **Rogelio Phone A**. During this call, CW-3 asked

---

[14]Unless otherwise noted, the consensual recorded telephone calls or in-person meetings between CW-3 and SILVA, ROSALIO, SERRANO, ROGELIO, and others set forth in this affidavit are in Spanish and the recorded conversations were reviewed by either a Spanish-speaking FBI agent or FBI contract employee. The summaries of these recorded conversations are based on a review of these recordings and/or draft, not final, transcripts. The summaries do not include all of the topics discussed during the conversations. During the recitation of calls or in-person meetings between CW-3 and SILVA, ROSALIO, SERRANO, ROGELIO, I have placed in brackets my understanding of the conversation which is based on CW-3's understanding of the call, an experienced FBI Special Agent's (who is assigned to this investigation) understanding of the call or code word used, and/or the context and content of the entire conversation and the investigation as a whole.

19

ROGELIO if CW-3 could see ROGELIO tomorrow between 2:00 p.m. and 3:00 p.m. and if he could

bring "one cousin" [one kilogram of cocaine]. In response, ROGELIO told CW-3 "Ok." CW-3 told

ROGELIO that they would call when they were ready [to buy the cocaine] which was going to be

between 2:00 p.m. and 3:00 p.m.

29.    On December 7, 2006, agents established surveillance on the detached garage of

CW-3's residence in anticipation of the one kilogram cocaine transaction. Additionally, FBI agents

installed a closed circuit television (CCTV) inside a workroom in the detached garage where the

transaction was expected to occur and monitored this CCTV from inside the residence. The CCTV

camera was set up to capture both audio and video surveillance of the transaction.

30.    At approximately 2:59 p.m., CW-3 placed a consensually recorded telephone call to

ROGELIO on **Rogelio Phone A**. During this call, CW-3 told ROGELIO to come over. ROGELIO

replied that he was not at home and would be over in about 30 minutes. At approximately 3:26 p.m.,

CW-3 placed a consensually recorded telephone call to ROGELIO on **Rogelio Phone A.** During this

call, CW-3 asked ROGELIO to hurry and ROGELIO responded that he was stuck in traffic and

would be there in ten minutes. At approximately 3:41 p.m., CW-3 received a telephone call from

ROGELIO, who was using **Rogelio Phone A**, which was consensually recorded. During this call,

ROGELIO told CW-3 that he was arriving. At approximately this same time, agents observed a

vehicle which was later determined to be a white Lincoln Continental, Illinois license plate number

849-1291, pull into the alleyway and park behind CW-3's residence.[15]

31.    At approximately this same time, CW-3 was provided with $18,500 in United States

---

[15] An NCIC inquiry revealed that this license plate was registered to ROSALIO SOBERANIS,
581 Elsie Drive, Melrose Park, Illinois.

undercover cash to purchase the kilogram of cocaine from ROGELIO. During this meeting, CW-3 was equipped with a concealed recording device which captures both audio and video. Agents then sent CW-3 from the residence to meet with ROGELIO in the alleyway[16].

32.    Shortly after arriving, agents observed an unknown Hispanic male (later determined to be SERRANO) exit from the driver's side of the Continental and ROGELIO exit from the front passenger's side of the vehicle and enter the garage.

33.    Agents monitoring the CCTV then observed CW-3, ROGELIO, and SERRANO enter the workroom inside the garage. Agents observed and a subsequent review revealed, among other things, the following: SERRANO hand CW-3 a large black shoe box style box; CW-3 hand ROGELIO the white plastic bag containing $18,500 in the undercover cash; CW-3 open the shoe box and remove a brick-shaped object wrapped in black tape (the suspected kilogram of cocaine), place the suspected cocaine on a workbench and cut into it while ROGELIO told CW-3 that "It's good shit, it's not mixed"; ROGELIO take the $18,500 out of the bag and appear to count it; ROGELIO ask CW-3 "Did you count this one [the $18,500]?"; CW-3 respond "It's five [$5,000 bundles] as usual [prior transactions]", ROGELIO say "I just want to take a look [at the money] and make sure." and CW-3 tell ROGELIO "It's eighteen five [$18,500]"[17]; ROGELIO hand the SERRANO a portion of the money and SERRANO appear to count it; ROGELIO take some of this money and put it into his wallet; CW-3 leave the suspected kilogram of cocaine in view of the CCTV camera; CW-3, ROGELIO, and SERRANO leave the workroom and close the door behind them.

---

[16] CW-3, the garage and workroom, and CW-3's vehicle parked in the garage were searched for drugs, weapons, and contraband with negative results.

[17] The $18,500 was packaged together in $1,000 bundles rubber banded together. Those $1,000 bundles were placed together in three separate $5,000 stacks and one $3,500 stack.

34.    At approximately 3:57 p.m., agents observed ROGELIO and SERRANO exit the garage, SERRANO enter the driver's side of the Continental, ROGELIO enter the passenger's side of the vehicle, and the vehicle depart the area.  Agents then followed ROGELIO and SERRANO.

35.    Moments later, at approximately 3:38 p.m., FBI agents met with CW-3, turned off the CW-3's concealed recording equipment, entered the workroom in the garage, seized the suspected kilogram of cocaine and shoe box, and turned off the CCTV recording equipment[18].

36.    At approximately 4:07 p.m., agents following ROGELIO and SERRANO observed them park the Continental and enter a business named Magnum Insurance, 3418 West Diversey Avenue, in Chicago, Illinois.

37.    At approximately 4:16 p.m., **Rogelio Phone A** called CW-3's cellular telephone but CW-3 was instructed by agents not to answer because the recording equipment was not ready to record the call.  Moments later, at approximately 4:17 p.m., CW-3 placed a consensually recorded telephone call to ROGELIO on **Rogelio Phone A**.  During this call, ROGELIO told CW-3 that he (ROGELIO) was being followed by a vehicle which ROGELIO described and that the person in that car had a camera.[19]

38.    At approximately 4:28 p.m., CW-3 placed a consensually recorded telephone call to ROGELIO on **Rogelio Phone A**.  During this call, ROGELIO explained that he had went to pay his insurance and a person in a vehicle had taken out a big camera.  In response, CW-3 told ROGELIO not to worry, that CW-3 took the cousin [the kilogram of cocaine that ROGELIO sold CW-3] out

---

[18] CW-3, the garage and workroom, and CW-3's vehicle parked in the garage were again searched for drugs, weapons, and contraband with negative results.

[19] An agent conducting surveillance was, in fact, driving a vehicle ROGELIO described during this call and this agent was attempting to take photographs.

22

already, and that if anything happens for ROGELIO to call CW-3.

39.    Agents continued followed SERRANO and ROGELIO to a residence located at 5141 West Montana Avenue, Chicago, Illinois, where they parked the Continental in the garage. This residence was later determined to be the residence for both SERRANO and ROGELIO, based upon later surveillance observations and intercepted telephone calls.

40.    A short time after arriving at the residence on Montana Avenue, SERRANO and ROGELIO departed in the Continental and agents followed them to the residence located at 581 Elsie Drive, Melrose Park, Illinois. This was later determined to be the residence for ROSALIO, based upon public records checks, later surveillance observations, and intercepted telephone calls, and it appears that ROGELIO was dropped off at this location.  A surveillance continued on SERRANO who departed in the Continental and ultimately returned to the residence on West Montana Street.

41.    On this same date, FBI agents transported this suspected cocaine to the FBI Chicago office where it was field tested, yielded a positive response for the presence of cocaine, and secured the cocaine into evidence. Laboratory analysis later confirmed that it was cocaine and determined that the net weight was 995.0 grams.

42.    On or about December 9, 2006, at approximately 3:27 p.m., CW-3 placed a consensually recorded telephone call to ROGELIO on **Rogelio Phone A**. During this call, CW-3 asked ROGELIO who was in charge, ROGELIO or the individual who came with him [SERRANO]? ROGELIO responded that he was in charge but that SERRANO works for the organization also. ROGELIO and CW-3 also discussed a surveillance agent that ROGELIO observed that day. ROGELIO explained that the person that ROGELIO saw in a vehicle taking pictures that he was

23

concerned about may have been just taking pictures of a building and not ROGELIO. ROGELIO explained that since nothing happened [no arrests] to either himself or CW-3, everything is fine. He told CW-3 to call when CW-3 needed ROGELIO.

**h.    SILVA Distribution of Heroin to CW-3 on December 12, 2006**

43.    On or about December 10, 2006, CW-3 contacted agents and reported that SILVA, using telephone number (773) 701-8766, had just called CW-3. This call was not recorded. During this call, according to CW-3, SILVA told CW-3 that he had a "Chinese Lady", which CW-3 understood to mean a quantity of white heroin. In response, CW-3 asked SILVA for a sample of it. SILVA agreed to give CW-3 a sample and asked CW-3 to call tomorrow.

44.    On or about December 11, 2006, at approximately 6:07 p.m., CW-3 placed a consensually recorded telephone call to SILVA on telephone number (773) 701-8766. During this call, CW-3 asked SILVA for the sample and SILVA told CW-3 that he had to get in touch with the kid who had the "photo" [sample of heroin]. CW-3 asked SILVA about the quality of the "Chinese Lady" [heroin] and SILVA said he didn't know. They agreed to meet around 5:00 p.m. the next day.

45.    On December 12, 2006, at approximately 5:04 p.m., CW-3 contacted an FBI agent and told the agent that SILVA, using telephone number (773) 701-8766, had just called CW-3. This call was not recorded. During this call, according to CW-3, SILVA told CW-3 that he had it [sample of heroin] and that he was at CW-3's office [garage]. CW-3 told SILVA that CW-3 was not at home and instructed SILVA to go to the Walgreens drug store at West Belmont Avenue and North Kimball Avenue. SILVA and CW-3 agreed to speak in 20 minutes.

46.    On December 12, at approximately 5:23 p.m., CW-3 contacted an FBI agent and told the agent that SILVA, using telephone number (773) 701-8766, had just called CW-3. This call was

24

not recorded. During this call, according to CW-3, SILVA told CW-3 that he was at the Walgreens and was waiting for CW-3. CW-3 told SILVA that CW-3 was in traffic and on the way.

47.     At approximately 5:40 p.m., FBI agents met with CW-3 and equipped CW-3 with a concealed recording device and equipped his vehicle with a concealed closed circuit television (CCTV) device which recorded both audio and video. CW-3 then departed to meet with SILVA at the Walgreens[20]. CW-3 was under constant surveillance from the meet site to the Walgreens with the exception of a few moments as CW-3 drove around a building next to the Walgreens.

48.     At approximately 5:44 p.m., agents established surveillance on the Walgreens drug store located at West Belmont Avenue and North Kimball Avenue in anticipation of the meeting between SILVA and CW-3.

49.     At approximately 5:45 p.m., agents observed CW-3 pull into the parking lot for Walgreens, park near a dark green colored Chevrolet Monte Carlo, Illinois license plate number 363 7629 which was observed to have two occupants. The driver of the Monte Carlo was observed by an agent as being a Hispanic male in his late twenties or early thirties. An inquiry with NCIC revealed that this license plate was registered to 2714 North Ridgeway, in Chicago, Illinois.[21] An agent then observed the same Hispanic male, enter CW-3's vehicle.

50.     At approximately 5:49 p.m., agents observed this Hispanic male exit CW-3's vehicle. Shortly thereafter, an agent observed this same Hispanic male driving the Monte Carlo depart from the Walgreens parking lot. CW-3 was under constant surveillance from the Walgreens back to the

---

[20]CW-3 and CW-3's vehicle were also searched for weapons and illegal substances with negative results.

[21]According to telephone toll and pen register data, **Target Phone 1** had 178 contacts with 773-499-3182 between July 14, 2006 and September 30, 2006, a number subscribed to a Roberto Silva, 2714 N. Ridgeway, Chicago, Illinois.

meet site with the exception of a few moments as CW-3 again drove around a building next to the Walgreens.

51.    At approximately 5:56 p.m. FBI agents meet with CW-3 and turned off the concealed recording and CCTV equipment. At approximately 5:57 p.m., CW-3 handed an FBI agent a brown chunky substance wrapped in two pieces of clear plastic wrap. Based on CW-3 statements and a review of the recordings, the individual who had met with CW-3 was "Shorty" (SILVA) and SILVA provided CW-3 with the sample of heroin and told CW-3 that the heroin was from Laredo [Texas] and that he could get CW-3 whatever quantity CW-3 desired. CW-3 inquired about prices for the heroin but SILVA did not know the prices. SILVA asked CW-3 if CW-3 had seen ROGELIO lately and CW-3 told SILVA that CW-3 had. SILVA also told CW-3 that he could supply CW-3 with kilogram quantities of cocaine and if they did anything [a cocaine transaction] it would be on the side [and SILVA would not tell ROGELIO about the transaction].[22]

52.    The suspected heroin was then transported to the FBI Office where it was field tested and yielded a positive response for the presence of heroin. Laboratory analysis later confirmed that it was 1.8 grams of heroin.

## IV.    WIRETAP INVESTIGATION

### A.    Authorization to Intercept Wire Communications

53.    On or about December 27, 2007, the Acting Chief Judge of the U.S. District Court for the Northern District of Illinois entered an order authorizing the interception for a period of 30 days of wire communications occurring over **Target Phone 1**, the principal user of which was URBINA, and **Target Phone 2**, the principal user of which was ROGELIO. Pursuant to the Court's

---

[22]CW-3 and the CW-3's vehicle were again searched for drugs, weapons, and contraband with negative results.

order, interceptions were conducted on **Target Phone 1** from on or about December 29, 2006

through on or about January 25, 2007 and on **Target Phone 2** from on or about December 28, 2006

through on or about January 25, 2007. On or about February 5, 2006, the Chief Judge of the U.S.

District Court for the Northern District of Illinois entered an order authorizing the continued

interception of wire communications on **Target Phone 1** for a period of 30 days and authorizing the

interception of wire communications on **Target Phone 3**, the principal user of which was

ROGELIO, for a period of 30 days. Pursuant to the Court's order, interceptions were conducted on

**Target Phone 1** and **Target Phone 3** from on or about February 6, 2007 through on or about March

6, 2007.

54.     In many of the intercepted calls, coded language was used to conceal the true nature

of the telephone calls.   At various points in this Affidavit, I have placed in brackets my

understanding of what was being said during the intercepted calls. My understanding is based on

the contents and context of the conversations, my experience as a law-enforcement officer, and the

experience of other law-enforcement agents and officers in this investigation. The times listed for

these calls are approximate. Finally, the summaries below do not include all potentially criminal

calls intercepted during the period of interception, or all statements or topics covered during the

course of the intercepted conversations. They do not represent finalized transcripts and may not

represent the entire conversation that occurred between the identified individuals.

55.     In addition, the language used during the majority of the intercepted conversations

summarized below was Spanish. Spanish-speaking agents and/or linguists have listened to the calls

and preliminarily translated the conversations into English.

**B.      Drug Distribution on January 5, 2007 (ROGELIO and SILVA)**

27

56.    On January 5, 2007, at approximately 4:58 p.m., SILVA called ROGELIO at **Target Phone 2** from telephone number (773) 801-8766, (Call Session 248). During the call, SILVA told ROGELIO that he needed "four or five shirts for the store" [possibly kilogram quantities of cocaine] and ROGELIO responded that "I have eight little points...three points" [possibly ounce quantities of cocaine]. SILVA commented "that's nothing".

57.    At approximately 5:55 p.m., ROGELIO used **Target Phone 2** to call SILVA at telephone number (773) 801-8766, (Call Session 254). During this call, ROGELIO asked SILVA "Do you want three little balls [possibly three ounces of cocaine] to play football? I have them." SILVA asked if ROGELIO really had them and ROGELIO replied that he did, "three and a half or four." SILVA told ROGELIO that he would let him know.

58.    At approximately 7:25 p.m., agents observed a dark green Volkswagon Jetta, Illinois license plate number 9916161, park on the street in the vicinity of ROGELIO's residence, located at 5141 West Montana Avenue, Chicago, Illinois. SILVA exited the Jetta and walked up to the front of ROGELIO's residence. At approximately this same time, SILVA called ROGELIO on **Target Phone 2** from telephone number (773) 801-8766, (Call Session 259), and told ROGELIO "I'm down here and the door is locked."

59.    At approximately 7:36 p.m., agents observed SILVA exit ROGELIO's residence and return to the Jetta. SILVA did not appear to be carrying any bags, but based on the intercepted calls, it is believed that he was picking up a small amount of narcotics, which could have been easily concealed on his person. The Jetta then departed the area and was followed by agents who observed among other things: the Jetta drive out of view in the alley in the 2700 block between North Hamlin Avenue and North Ridgeway Avenue; the Jetta exit onto West Schubert Avenue from the above

28

referenced alley and then shortly thereafter enter and exit another alley; drive in a circuitous manner in the vicinity of the 2900 block of North Wisner Avenue; eventually park on the 2900 block of North Wisner Avenue; and the driver exit the vehicle and walk out of view. In addition, a few minutes after the driver exited the Jetta and walked out of view, an individual was observed standing in front of 2976 North Wisner Avenue, the registered address for the Jetta, talking on a cellular telephone while looking in the direction of surveillance agents who were parked nearby.

C.    **Involvement of ROGELIO, ROMO, and SERRANO in Drug Debt Payment to CW-3 on January 12, 2007**

60.    On or about January 9, 2007, at approximately 5:15 p.m., ROGELIO used **Target Phone 2** to call SERRANO at telephone number (773) 557-5876, (Call Session 452). During this call, ROGELIO told SERRANO that he and ROMO had made plans to go see CW-3, but that they decided to go the next day. SERRANO asked if ROGELIO was going to go to CW-3's and for ROGELIO not to go by himself. SERRANO told ROGELIO that they would go the next day and to tell ROMO to get ready.

61.    On or about January 10, 2007, at approximately 1:21 p.m., ROGELIO used **Target Phone 2** to call ROMO at telephone number (773) 725-0954, (Call Session 476). During this call, ROGELIO told ROMO that he needed to take care of it and ROMO agreed to see ROGELIO in one half of an hour.

62.    At approximately 1:22 p.m., ROGELIO used **Target Phone 2** to call SERRANO at telephone number (773) 557-5876, (Call Session 477). During this call, SERRANO asked ROGELIO if he [ROMO] was there and ROGELIO responded that he [ROMO] would be there in one half an hour. SERRANO said "I will be there."

29

63.     At approximately 1:23 p.m., ROGELIO used **Target Phone 2** to call CW-3, (Call Session 478).  During this call, ROGELIO told CW-3 that "the man" from Mexico, whom ROGELIO said he had told CW-3 about, arrived the previous day.  ROGELIO also told CW-3 that he [the man] is on his way over here and would be arriving in about a half an hour.  CW-3 responded that CW-3 would not be available until later in the afternoon and would call ROGELIO.

64.     At approximately 1:37 p.m., ROGELIO used **Target Phone 2** to call CW-3 (Call Session 483).  During this call, ROGELIO said he [ROMO] just arrived and wanted to talk to CW-3. At that time, ROMO got on the telephone and said that he was with Roger [ROGELIO] and wanted to meet and talk to CW-3.  ROMO and CW-3 agreed to meet at 3:30 p.m. at a Dunkin Donuts, located at West Belmont Avenue and North Kimball Avenue in Chicago, Illinois.  ROGELIO then got back on the telephone.  CW-3 asked ROGELIO if he [ROMO] wanted to talk to CW-3 about the 22,000 [$22,000.00 owed to ROGELIO by CW-3].  ROGELIO replied that it was and that he [ROMO] just wanted to talk [there would be no forced payment or violence].  ROGELIO also told CW-3 that he [ROMO] was upset and that he [ROGELIO] would not be coming to the meeting, but that he [ROMO] knows "how you are paying me."  CW-3 asked how CW-3 would recognize him [ROMO] and ROGELIO replied that "he will be there with the other guy [SERRANO]".

65.     At approximately 3:34 p.m., CW-3, who had been equipped with concealed recording and transmitting devices, arrived and entered the Dunkin Donuts.  In advance and in anticipation of this meeting, agents established surveillance at the Dunkin Donuts.  At approximately 3:44 p.m., agents observed a black Chevrolet Blazer with tinted windows, Illinois license plate number 3 8 5 8 9 3 0 [23] ,    e n t e r    a n d    p a r k    n e x t    t o    C W -

---

[23] An NCIC inquiry revealed that this license plate was registered to registered to an individual whose last name was "Romo," 4815 West Wolfram Avenue, Chicago, Illinois, and that this

3's vehicle at the Dunkin Donuts.  SERRANO and an unknown older Hispanic male, later determined to be ROMO, exited the vehicle and entered the Dunkin Donuts.

66.    At approximately 4:00 p.m., CW-3 exited the Dunkin Donuts with SERRANO and ROMO. Agents observed the three briefly speaking in the parking lot and then observed SERRANO and ROMO enter the black Blazer and depart. Agents followed SERRANO and ROMO. During the surveillance, agents observed the Blazer drive by ROGELIO's residence and then eventually lost the vehicle in traffic.

67.    At approximately 4:11 p.m., ROGELIO used **Target Phone 2** to call SERRANO at telephone number (773) 557-5876, (Call Session 488). During this call, ROGELIO asked if he had talked yet and SERRANO replied that they had. ROGELIO then asked what he said and SERRANO said that "[CW-3] is going to give us 5,000 [$5,000] on Friday." SERRANO told ROGELIO that when he threatened to take his/her [CW-3's] truck, he/she [CW-3] offered "to give ROMO 5,000" on Friday. SERRANO told ROGELIO that "[CW-3] asked me who I was" ... "I told him I was El Negro." SERRANO told ROGELIO not to worry that "we are going to get your money back."

68.    FBI agents also followed CW-3 from the meeting to a pre-arranged meeting location where an agent removed and deactivated the concealed recording and transmitting devices[24]. CW-3 told agents that CW-3 met with SERRANO and the older Hispanic male, whose name during the meeting CW-3 learned was JOE. CW-3 reported, among other things, that: JOE was in town

license plate was for a 1991 Nissan two-door with suspended plates for a mandatory insurance violation.

[24] When agents later attempted to retrieve the recording from the device, it was discovered that a recording from a previous unrelated investigation was still on the device and, as a result, the meeting between CW-3, SERRANO, and ROMO was not recorded. However, portions of this meeting were overheard by a Spanish-speaking FBI agent who was able to relay that the meeting concerned CW-3 discussing paying money.

collecting money that was owed for drug trafficking; JOE had approximately $80,000 in outstanding narcotics debts to collect; JOE was starting to make efforts to collect this debt; CW-3 told JOE that CW-3 was paying $1,000 extra for each kilogram of cocaine purchased from ROGELIO to pay toward CW-3's debt; that during the last cocaine transaction CW-3 participated in with ROGELIO and SERRANO, CW-3 observed ROGELIO place $1,000 into his (ROGELIO's) wallet; JOE gets in approximately 50 kilograms of cocaine at a time; CW-3 could repay the debt faster if they (SERRANO and JOE) gave CW-3 a better price for kilograms of cocaine and if CW-3 purchased between 10 and 15 kilograms of cocaine at a time; JOE wanted CW-3 to repay his debt prior to engaging in transactions that size; and that they agreed that CW-3 would make an initial payment of $5,000 to SERRANO on Friday.

69.     On or about January 12, 2007, at approximately 2:40 p.m., agents established surveillance on ROGELIO and SERRANO's residence and also the detached garage of CW-3's residence in anticipation of the $5,000 payment. Additionally, FBI agents installed two CCTV cameras inside a workroom in the detached garage of CW-3's residence where the transaction was expected to occur and monitored this CCTV from inside the residence. The CCTV camera was set up to capture both audio and video surveillance of the transaction.

70.     On this same day, at approximately 2:59 p.m., CW-3 placed a consensually recorded telephone call to SERRANO at telephone number (773) 557-5876. During this call, CW-3 told SERRANO that CW-3 was ready and SERRANO told CW-3 that he would be there in 25 minutes.

71.     At approximately 3:37 p.m., an agent observed SERRANO enter ROGELIO's silver Chrysler Concorde, Illinois license plate number 981 2065, and leave the area.

72.     At approximately 3:55 p.m., CW-3 received a call from SERRANO who was using

telephone number (773) 557-5876. During this recorded call, SERRANO told CW-3 that he was in front of CW-3's residence. CW-3 instructed SERRANO to come to the garage. At approximately this same time, CW-3 was provided with $5,000 in undercover United States Currency contained in a white envelope and was directed by agents to go to the garage to meet SERRANO.[25]

73.     Agents monitoring the CCTV then observed CW-3 and SERRANO enter the workroom inside the garage. Agents observed and a subsequent review revealed of the recordings revealed, among other things, the following: CW-3 hand the white envelope containing the $5,000 to SERRANO; SERRANO take the envelope, open the envelope, and appear to count the money; SERRANO put the money back into the envelope; SERRANO take a cellular telephone out of his right hand side vest pocket and make a telephone call which was intercepted on **Target Phone 2**, revealing that at approximately 4:09 p.m., SERRANO used telephone number (773) 418-4956, (Call Session 541), to call ROGELIO and told ROGELIO that "he [CW-3] kept his word, I have the money [$5,000]"; SERRANO take the same cellular telephone out of his pocket and look at it; SERRANO take another cellular telephone out of his left hand side vest pocket and look at it; SERRANO put the envelope into his pant's pocket; and CW-3 and SERRANO exit the workroom of the garage.

74.     At approximately 4:22 p.m., agents observed SERRANO exit CW-3's garage, enter the Chrysler Concorde which was observed parked on a nearby street, and leave the area. Agents followed SERRANO to his residence where he was observed parking the Concorde and entering the residence.

---

[25]Prior to, and after, meeting with SERRANO, CW-3, CW-3's vehicle inside the garage, and the garage were searched for firearms, additional cash, and controlled substances with negative results.

**D.    January 14, 2007 Narcotics Shipment (ROGELIO, SERRANO, URBINA, LOPEZ, SILVA)**

75.    On or about January 13, 2007, at approximately 9:05 p.m., ROGELIO received an incoming call on **Target Phone 1** from SERRANO who was calling from (773) 557-5876 (Call Session 588). During this call, SERRANO said "Compadre, call El Papa [ROMO], some material [cocaine] has arrived." ROGELIO said "What?" and SERRANO repeated "There's some material [cocaine] now" and that he [SERRANO] is making arrangements and for ROGELIO to call "Papa [ROMO]" so he can be ready early tomorrow.

76.    At approximately 9:09 p.m., ROGELIO used **Target Phone 2** to call URBINA on **Target Phone 1**, (Call Sessions 593 and 1623, respectively).  During this call, ROGELIO told URBINA that "The things [cocaine] are here." URBINA asked "Do you have work [cocaine] there" and ROGELIO told him "Yes" and for URBINA to call him tomorrow.  URBINA then told ROGELIO that the "Hairy girls" [possibly marijuana] are also here and they agreed to meet the following day.

77.    The next day, January 14, 2007, at approximately 10:42 a.m., URBINA used **Target Phone 1** to call SILVA at telephone number (773) 701-8766, (Call Session 1629). During this call, URBINA asked SILVA "Is there anything [cocaine]." SILVA answered "No nothing." URBINA then confronted SILVA and told him that "Gato [SERRANO] says you got one [kilogram of cocaine] from him yesterday." SILVA replied "No, he's crazy." URBINA told SILVA that "Rogelio [ROGELIO] is pissed off at you" because "You're working [distributing narcotics] with Gato [SERRANO] and not asking him [ROGELIO]."

78.    At approximately 10:46 a.m., ROGELIO received a call on **Target Phone 2** from SILVA calling from telephone number (773) 701-8766, (Call Session 606). During this call, SILVA

asked ROGELIO "You're pissed off because I'm working [distributing narcotics] with Gato [SERRANO]?" ROGELIO responded "Yes that's what he [SERRANO] was telling me." SILVA explained "They did take one [kilogram of cocaine] but at the same price as you get it for, at 18 [$18,000] and change." "I was just helping out that man [customer] that wanted one." "I didn't make any profit and I don't know how much Gato got it for [SERRANO paid for the cocaine]." Later in the conversation, ROGELIO told SILVA "Well ok, mine [shipment of cocaine] is coming, don't worry."

79.    At approximately 10:58 a.m., ROGELIO used **Target Phone 2** to call LOPEZ at telephone number (773) 931-7074, (Call Session 608). During this call, LOPEZ told ROGELIO that "There are 290 girls [pounds of marijuana] here now that are looking for work" and that he doesn't know their "hourly rate [price]." ROGELIO asked LOPEZ what the "hourly rate [price]" was and LOPEZ said he thinks it is "430 [$430] each." ROGELIO then explained to LOPEZ that there were "300 girls here now" and their "hourly rate" is 4 [$400 per pound]." LOPEZ asked how much they "charge per hour [price per pound]" and ROGELIO said "at 6 [$600 per pound]". ROGELIO and LOPEZ then went on to discuss who to sell the marijuana to and LOPEZ suggested combining the "girls [marijuana] that are here and the ones [marijuana] that are coming tomorrow" and that they should sell "20 [pounds], 30 [pounds] at a time." LOPEZ then asked if ROGELIO was "going to open the shop [sell cocaine]"and ROGELIO replied that he thought so. LOPEZ said to ROGELIO that there was someone, who he referred to as the dealer, who will "want it in two's [possibly two kilograms at a time]". ROGELIO said that "there is some [kilograms of cocaine], but they are expensive" and that the price is "7, 5 without profit [$17,500 per kilogram of cocaine]." LOPEZ told ROGELIO that there is a customer who comes from up north and another one who comes from

35

downtown and when ROGELIO asked "at how much", LOPEZ replied "it depends, but maybe 20 per car [$20,000 per kilogram]."

80.    At approximately 11:33 a.m., ROGELIO used **Target Phone 2** to call INDIVIDUAL B (Call Session 609). During this call, ROGELIO told  INDIVIDUAL B that "there's green bales right now [marijuana]", that "they are here now", and that he [ROGELIO] is waiting on "a photo [sample]." INDIVIDUAL B asked for "10 [ten pounds of marijuana]" and ROGELIO said "Yes."

81.    At approximately 11:55 a.m., agents established surveillance on ROGELIO's residence in anticipation of a narcotics transaction between ROGELIO, SERRANO, and URBINA.

82.    At approximately 1:01 p.m., agents observed a white Lincoln Continental[26] exit from the detached garage with two occupants and followed them. Agents followed the Continental to a strip mall parking lot located at the intersection of West Fullerton Avenue, and North Grand Avenue, in Chicago, Illinois. At that time, agents observed SERRANO exit from the driver's side of the Continental and an unknown Hispanic male exit from the passenger's side. Shortly thereafter, SERRANO and this individual entered Las Islas Marias Mexican Seafood Restaurant located at this same intersection.

83.    At approximately 1:42 p.m., URBINA received a call on **Target Phone 1** from INDIVIDUAL C (Call Session 1656). During this call, URBINA told INDIVIDUAL C, "There is a guy [ROGELIO] who has them [quantities of cocaine] at 6 [possibly $600 per ounce]." INDIVIDUAL C asked "If I give you 3 [$3000] will you wait for me [provide the remainder of the cocaine on credit]." Later in the call, INDIVIDUAL C explained that if URBINA couldn't provide

---

[26] This is the same vehicle ROGELIO and SERRANO used to transport the kilogram of cocaine which CW-3 purchased on December 7, 2006, and matches CW-3's description of the vehicle which has a concealed compartment under the rear seat.

the cocaine on credit then "Just give me three pesos worth [$3,000 worth of cocaine]." URBINA told INDIVIDUAL C, "Let me tell him [ROGELIO] and I'll call you back."

84.     At approximately 1:58 p.m., URBINA received a call on **Target Phone 1** from INDIVIDUAL D (Call Session 1658). During this call, INDIVIDUAL D told URBINA that he was going to see "A car [cocaine]" that is "a bit higher [more expensive]" explaining that it was "at six five [$650 per ounce]." In response, URBINA told INDIVIDUAL D that it was "Too high [expensive]."

85.     At approximately 2:33 p.m., URBINA received a call on **Target Phone 1** from INDIVIDUAL C (Call Session 1667). During this call, INDIVIDUAL C told URBINA that "My wife is going out in an hour and she is going to lend me the money [for the cocaine]."

86.     At approximately 2:35 p.m., ROGELIO used **Target Phone 2** to call URBINA on **Target Phone 1**, (Call Sessions 627 and 1669, respectively). During this call, URBINA asked ROGELIO if he had "Six balls [six ounces of cocaine]" and ROGELIO responded "Yeah." URBINA told ROGELIO to get ready and that he would see ROGELIO around there [ROGELIO and SERRANO's residence].

87.     At approximately 3:26 p.m., URBINA received a call on **Target Phone 1** from SERRANO using telephone number (773) 557-5876 (Call Session 1673). During this call, SERRANO asked URBINA "How long before you get to the house [ROGELIO and SERRANO's residence]." URBINA told SERRANO "See you in an hour." SERRANO then told URBINA "That's there already [the cocaine is ready]."

88.     At approximately 3:28 p.m., ROGELIO received a call on **Target Phone 2** from SERRANO who was calling from telephone number (773) 557-5876, (Call Session 630). During

37

this call, ROGELIO told SERRANO that he was at home. SERRANO told ROGELIO that he's taking "the stuff [cocaine]" to the house and should be there in 40 minutes.

89.    At approximately 3:30 p.m., agents observed SERRANO talking on a cellular telephone, enter the Continental alone, and depart the area. Agents conducting surveillance followed SERRANO.

90.    Starting at approximately 3:59 p.m., agents observed, among other things: SERRANO drive northbound on North Albany Avenue, pull into an alley way, park, and use a cellular telephone; pull back onto North Albany Avenue and double park; an unknown individual described as a Hispanic male in approximately his 30's enter the passenger's side of the Continental carrying something; SERRANO and this individual drive around the block onto North Whipple Street and park; SERRANO exit the driver's seat of the Continental and lean into the rear seat area; and then SERRANO and the individual depart the area. Agents continued to follow SERRANO and the individual he picked up on North Albany Avenue.

91.    At approximately 4:13 p.m., URBINA received a call on **Target Phone 1** from SERRANO using telephone number (773) 557-5876, (Call Session 1682). During this call, SERRANO told URBINA "I am already here with what you asked for, ok."

92.    At approximately 4:17 p.m., agents observed SERRANO and his passenger turn eastbound onto West Montana Street, into the alley way, and park inside the detached garage behind SERRANO's residence. Shortly thereafter, SERRANO and this individual were observed by agents walking from the gangway area running along the west side of the house to the front of the residence and in the front door. At that time, agents observed that when SERRANO walked into the house he was carrying what appeared to be at least one white plastic shopping bag.

93.    At approximately 4:23 p.m., agents observed URBINA walk up to, and stand on the front porch of ROGELIO's residence. Minutes later, agents observed ROGELIO exit the residence, stand on the front porch and talk to URBINA, ROGELIO and URBINA enter URBINA's grey Acura Legend which was parked on West Montana Street, and depart the area.

94.    Agents followed ROGELIO and URBINA as they left the residence, drove a few blocks, and parked on a side street. After several minutes, they drove back to ROGELIO's residence, parked, and entered the residence.

95.    At approximately 4:45 p.m, agents observed URBINA exit ROGELIO's residence, enter his Acura, and depart the area. Agents attempted to follow URBINA but lost contact with him shortly after leaving ROGELIO's residence. A few minutes later an agent observed URBINA sitting in a supermarket parking lot located on West Fullerton Avenue, just west of the intersection with North Lavernge Avenue, alone in his Acura. Minutes later agents observed a Hispanic female enter the passenger side of the Acura and URBINA and this women exit the parking lot heading westbound of West Fullerton Avenue. Shortly after they departed agents lost contact with them after they made a u-turn on a street and agents were unable to follow them.

E.    **Interceptions of ROGELIO and URBINA Regarding Attempted Cocaine Transaction on January 19, 2007**

96.    On or about January 19, 2007, at approximately 2:18 p.m., ROGELIO used **Target Phone 2** to call URBINA on **Target Phone 1**, (Call Sessions 896 and 2044, respectively). During this call, URBINA asked ROGELIO "Are you going to rent me that?" [provide a quantity of narcotics to URBINA] and ROGELIO said to "hold on". The call then disconnected.

97.    At approximately 2:19 p.m., ROGELIO used **Target Phone 2** to call URBINA on

39

**Target Phone 1**, (Call Sessions 897 and 2046, respectively). During this call, ROGELIO told URBINA that it would be in about "two hours". URBINA questioned the time and then asked if ROGELIO was sure. ROGELIO said "That's what he told me now."

98.    At approximately 3:56 p.m., ROGELIO received a call on **Target Phone 2** from INDIVIDUAL E (Call Sessions 905). During the call, INDIVIDUAL E asked how much for "one car with four wheels" [one kilogram of cocaine]. ROGELIO asked "a whole one?" and after INDIVIDUAL E responded yes, ROGELIO said "I'm scared." INDIVIDUAL E told ROGELIO that he would bring the "tickets" [money] first because "without the tickets, I will not work." ROGELIO said "at 1-8" [$18,000] and INDIVIDUAL E said that he would "tell the guy 8-5" [$18,500] ... "so you get 5 also" [ROGELIO could make a $500 profit]. INDIVIDUAL E told ROGELIO that he would count "the tickets at his house first" [count the money at the customer's house] and would call ROGELIO when he was on his way.

99.    At approximately 4:05 p.m., URBINA used **Target Phone 1** to call ROGELIO on **Target Phone 2**, (Call Sessions 2063 and 906, respectively). During this call, ROGELIO said that there "Is some [cocaine] but I don't have enough of what you want." and URBINA replied "How much do you have?" ROGELIO told URBINA "Half of it" and URBINA asked "Does that dude [SERRANO] have any?" And ROGELIO replied "They are going to bring it."

100.    At approximately 4:19 p.m., ROGELIO used **Target Phone 2** to call INDIVIDUAL E (Call Session 908). During this call, ROGELIO said "we are going to do that [conduct the cocaine transaction] in one hour and 40 minutes" and they agreed for INDIVIDUAL E to come to ROGELIO's alone.

101.    At approximately 4:44 p.m., URBINA used **Target Phone 1** to call ROGELIO on

40

**Target Phone 2**, (Call Sessions 2069 and 909, respectively). During this call, URBINA asked "Are we doing it? [conduct the cocaine transaction]" and ROGELIO replied "I think, it is going to be done later, like in 20 minutes." URBINA responded that "I drove by there and did not see your car" and ROGELIO replied "I don't have it here. (unintelligible) garage. [ROGELIO was likely telling URBINA that the car was parked in the garage]" URBINA told ROGELIO that he would come by.

102.    At approximately this same time, agents who had established surveillance at ROGELIO's residence, observed URBINA drive past ROGELIO's residence in his grey Acura Legend. A few minutes later, at approximately 4:50 p.m., the Acura was re-observed parking in the vicinity of ROGELIO's residence.

103.    At approximately 4:51 p.m., URBINA used **Target Phone 1** to call ROGELIO on **Target Phone 2**, (Call Sessions 2070 and 910, respectively). During this call, URBINA asked ROGELIO to "Open up." At approximately this same time, URBINA exited the Acura and, while talking on a cellular telephone, walked across the street to the front door of the residence and enters the residence.

104.    At approximately 5:08 p.m., agents observed ROGELIO and URBINA exit ROGELIO's residence, enter URBINA's Acura, and depart the area. Agents attempted to follow them, but lost them in the neighborhood.

105.    At approximately 5:15 p.m., your Affiant observed the garage door behind ROGELIO's residence open and an individual believed to be SERRANO enter the white Lincoln Continental. Because agents were still attempting to locate URBINA and ROGELIO in the Acura, the Continental was not followed.

106.    At approximately 5:19 p.m., URBINA received a call on **Target Phone 1** from

41

INDIVIDUAL F (Call Session 2075). During this call, URBINA said "this man [ROGELIO] does not have enough, he only has 4½" [4½ ounces of cocaine] and "we are waiting for another guy [SERRANO] that is going to bring it".

107.   At approximately 5:41 p.m., agents observed URBINA and ROGELIO, in the Acura, return and enter the residence. At this same approximate time, ROGELIO used **Target Phone 2** to call SERRANO at telephone number (773) 418-4956, (Call Session 912). During this call, ROGELIO asked SERRANO where he was and he replied "I am doing some things. I came to see the attorney [cocaine supplier]." They discussed which door was locked at the house and then SERRANO told ROGELIO "I will be there in five minutes." ... "I am on Fullerton and Pulaski."

108.   At approximately 5:53 p.m., your Affiant observed the Continental travel west on West Fullerton Avenue from the direction of North Pulaski Avenue, turn north on North Laramie Avenue, turn east into an alley, and pull up in front of the garage behind ROGELIO's residence. Your Affiant then observed the garage door open, the Continental pull in nose first, the garage door partially close and open a couple of times, and then an individual believed to be SERRANO exit the passenger side of the Continental and appear to activate a switch on the garage wall. The garage door then closed.

109.   At approximately 5:59 p.m., ROGELIO used **Target Phone 2** to call INDIVIDUAL E (Call Session 914). During this call, ROGELIO said "it is not going to happen" [kilogram of cocaine transaction] and INDIVIDUAL E replied that it was okay, but INDIVIDUAL E needed "phone cards [smaller amount of cocaine]." ROGELIO agreed and INDIVIDUAL E said he would "tell him" [notify his customer] and "I will be back with that [money for the smaller quantity of cocaine]."

42

110.    At approximately 6:13 p.m., ROGELIO received a call on **Target Phone 2** from INDIVIDUAL E (Call Sessions 921). During this call, ROGELIO told INDIVIDUAL E that "We can only do the card now [conduct a small narcotics transaction]." INDIVIDUAL E asked "Which card?" and ROGELIO replied "63" and that "everything else for tomorrow because it is shut down over there [the remaining narcotics tomorrow, nothing is available tonight]."

111.    At approximately 6:45 p.m., URBINA was observed exiting ROGELIO's residence, entering his Acura, and departing the area. He was not followed by agents.

112.    At approximately 6:47 p.m., URBINA used **Target Phone 1** to call INDIVIDUAL F (Call Session 2082). During this call, URBINA told INDIVIDUAL F that he only received "4½" [ 4½ ounces of cocaine].

113.    At approximately 7:05 p.m., ROGELIO received a call on **Target Phone 2** from INDIVIDUAL E (Call Sessions 926). In this call, INDIVIDUAL E said "I am here by the pump [fire hydrant]." and ROGELIO replied "OK." At approximately the same time, agents observed a green Chevrolet Astrovan with Illinois temporary license plate 823G024, turn onto West Montana Street, and park on the street in the vicinity of ROGELIO's residence.

114.    At approximately 7:07 p.m., ROGELIO was observed on his front porch, looking around. ROGELIO was then observed walking to the vicinity of the Astrovan. At approximately 7:22 p.m., ROGELIO was observed walking back toward his residence. The Astrovan departed and was followed by Agents. Agents lost the Astrovan in traffic, but re-observed it parked, unoccupied across the street from 3221 North Kildare Avenue, Chicago, Illinois, the Astrovan's registered address.

## F.    Detection of Law Enforcement on January 24, 2007 and Countermeasures Taken by ROGELIO, URBINA, ROSALIO, SERRANO

43

115.    On or about January 22, 2007, during a surveillance at ROGELIO's residence, an agent was approached by an employee of "Busy Bee Board Up & Construction," a business located near the residence and at 2435 N. Laramie Avenue, Chicago, Illinois (hereinafter "the business"). The agent identified himself and told the employee that he was looking at a residence in the area.

116.    On or about January 24, 2007, at approximately 1:03 p.m., ROGELIO received a call on **Target Phone 2** from INDIVIDUAL E (Call Session 1127). During this call, INDIVIDUAL E referred to ROGELIO as "uncle" and told him that he had to talk to ROGELIO. INDIVIDUAL E said "It is very important. Don't do anything in that house [ROGELIO's residence]. My friend works across the street [the business] and he says that there are some people there working on someone.[investigating someone]" INDIVIDUAL E went on to explain that he just found out and for ROGELIO not to "work from there anymore." INDIVIDUAL E asked if ROGELIO could come to see him and ROGELIO replied "...get rid of that. No more. Erase it. Right now I am not selling anything. Tomorrow..." ROGELIO asked "Are they (unintelligible)" and INDIVIDUAL E replied "They are . . .the people from the three letters. [possibly FBI[27]]"

117.    At approximately 1:06 p.m., ROGELIO used **Target Phone 2** to call SERRANO at telephone number (773) 418-4956, (Call Session 1128). During this call, ROGELIO instructed SERRANO "Don't bring anything to the house right now [narcotics]". SERRANO asked why and ROGELIO went on to explain that "The job that is across the street from the house [the business]", "The one that is from the bees and all of that [the business, Busy Bee Board Up & Construction]", "The guys from the three letters are there. They are watching everything. They go in there and spy

---

[27] Usually the "three letters" refers to federal law enforcement, but since the agent who identified himself to the business was an FBI agent, it is your Affiant's belief that this is who INDIVIDUAL E is referring to.

there. Someone told me they saw them there."

118.    At approximately 3:08 p.m., ROGELIO used **Target Phone 2** to call ROSALIO at

telephone number (773) 837-7915, (Call Session 1143). During this call, ROGELIO told ROSALIO,

"Don't go over to the house. Tell Gato [SERRANO] to leave there and meet him in another place."

ROSALIO replied "I am going to pick him up there." ROGELIO told ROSALIO to "Tell him to

leave the house and meet you in another place and you can pick him up somewhere else...Remember

the factory that is across from the house? [the business]... There are some there. They are checking."

119.    At approximately 3:22 p.m., agents observed SERRANO exit ROGELIO's residence

and walk west on West Montana Avenue, while talking on a cellular telephone. SERRANO walked

south on North Laramie Avenue out of view and was not re-observed at the next intersection to the

south.

120.    On January 25, 2007, at approximately 10:35 a.m., ROGELIO received a call on

**Target Phone 2** from ROMO calling from telephone number (773) 725-0954, (Call Session 1160).

During this call, ROGELIO told ROMO that "I am going to have another phone number. Put credit

on your phone so I can call you with the new number." ROMO said "It can't be done today? [a

narcotics transaction]" and ROGELIO said "No papa, there is a problem there." ROGELIO then

repeatedly instructed ROMO "Don't go over to the house." They agreed to meet later to talk.

121.    At approximately 4:25 p.m., URBINA received a call on **Target Phone 1** from

ROGELIO calling from **Target Telephone 3**, (Call Session 2507). During this call, ROGELIO told

URBINA that "this is my new number" ... "you have to change yours, so you can get a new one."

122.    At approximately 6:02 p.m., URBINA received a call on **Target Phone 1** from

ROGELIO calling from **Target Telephone 3**, (Call Session 2515). During this call, ROGELIO

45

asked URBINA, "Do you remember that work, that's by the house, with the bees? [the business]" URBINA questioned ROGELIO, "The work?" and ROGELIO said, "Yeah, that working company that is there, by the house. The factory that's right by the house?" URBINA responded, "Uh-huh." and ROGELIO explained to URBINA, "Well that's where, that's where the guys are at. They're checking from there." A little later in the conversation ROGELIO told URBINA "A guy called me. A friend of mine, who has a friend that is working there."

123.    By mid-February 2007, agents were able to determine that ROGELIO had, in fact, moved from his residence at 5141 West Montana Avenue, Chicago, Illinois, into an apartment located at 1043 North Drake Avenue, Chicago, Illinois. He appeared to be sharing this residence with LOPEZ.

### G.    Two Cocaine Samples and Further Repayments of CW-3's Drug Debt on January 25, 2007 (ROGELIO, SERRANO, ROSALIO, SILVA)

124.    On or about January 23, 2007 CW-3 contacted an agent and reported that SERRANO used telephone number (773) 557-5876 to call CW-3. This call was not recorded. Agents later inspected CW-3's cellular telephone which had recorded an incoming call from telephone number (773) 557-5876 at 1:53 p.m. on January 23, 2007. According to CW-3, during this call SERRANO offered CW-3 cocaine and offered to bring CW-3 a picture, which CW-3 understood to mean a sample of cocaine.

125.    On or about January 24, 2007, at approximately 3:30 p.m., ROGELIO used **Target Phone 2** to call CW-3, (Call Session 1146). During this call, ROGELIO told CW-3 that he was sending "those guys[28]" to meet with CW-3, so CW-3 could give them "the money that you have to

---

[28] It is your Affiant's belief that ROGELIO was referring to ROMO and SERRANO, who had met with CW-3 on January 10, 2007, to set up a payment plan for CW-3's drug debt.

give them [another payment toward CW-3's drug debt]." After going back and forth about the

conditions of the agreement, ROGELIO told CW-3 that they would be bringing another individual

who would be collecting the money. ROGELIO told CW-3, "So that you can meet they guy...the one

that you are going to give the money to." CW-3 told ROGELIO that the meeting would have to be

the following day and for them to call CW-3 to set up a time. In addition, during the course of the

conversation, ROGELIO then told CW-3 "Or at the end of this month could you have the other five

[$5,000], so I can tell the guy [ROMO]? Because he wants it in these two months and then that's it.

This month and the next month, so you can finish with that debt."

126.    On or about January 25, 2007, at approximately 3:16 p.m., CW-3 received a telephone

call from SERRANO who was using telephone number (773) 557-5876. This call was not recorded,

but was received in the presence of your Affiant and another agent. According to CW-3, among the

things discussed, SERRANO told CW-3 that he would be at CW-3's residence in approximately half

an hour and was bringing someone else for CW-3 to meet.

127.    On this same day, at approximately 3:20 p.m., agents established surveillance on the

detached garage of CW-3's residence in anticipation of the arrival of SERRANO and the unknown

individual. Additionally, FBI agents installed a CCTV camera inside a workroom in the detached

garage of CW-3's residence where the transaction was expected to occur and monitored this CCTV

from inside the residence. The CCTV camera was set up to capture both audio and video

surveillance of the transaction.

128.    At approximately 4:08 p.m., CW-3 received a telephone call from SERRANO who

was using telephone number (773) 557-5876. This call was recorded. During this call and according

to CW-3, SERRANO told CW-3 that he would be at CW-3's residence in an hour and would be

bringing a picture, understood by CW-3 to be a sample of cocaine. Additionally, SERRANO told CW-3 that he has his own thing and has a lot of work, understood by CW-3 to mean cocaine to sell.

129.    At approximately 5:34 p.m., agents observed a red Ford Expedition, Illinois license plate number 942-7552[29], parked behind CW-3's residence.

130.    At approximately 5:35 p.m., CW-3 received a call from SERRANO who was using telephone number (773) 557-5876. This call was recorded. During this call and according to CW-3, SERRANO told CW-3 that he was there. At approximately this same time, CW-3 was directed by agents to go to the garage to meet SERRANO.[30]   CW-3 and SERRANO had agreed during their conversation on January 24, 2007, referenced above, that CW-3 would not make a payment at the meeting. Therefore, CW-3 was not provided with any undercover funds to make a drug debt payment.

131.    Agents monitoring the CCTV then observed CW-3, ROSALIO, and SERRANO enter the workroom inside the garage. Agents observed and a subsequent review of the recording revealed, among other things, the following: SERRANO hand CW-3 what appeared to be a small baggie; SERRANO, and ROSALIO exit the workroom briefly and then return; SERRANO appear to show ROSALIO the display on his cellular telephone, and then CW-3's telephone ring; and then CW-3, ROSALIO, and SERRANO exit the workroom in the garage. In addition, a preliminary transcription of the recording revealed the following: after CW-3 received the small baggie, CW-3 asked "This is the sample [of cocaine]?" and SERRANO replied "Yes." CW-3 then asked "How's

[29] An NCIC inquiry revealed that this license plate was registered to ROSARIO SOBERANIS, 581 Elsie, Melrose Park, Illinois.

[30] Prior to, and after, meeting with SERRANO and ROSALIO, CW-3, CW-3's vehicle inside the garage, and the garage were searched for firearms and controlled substances with negative results.

this [the quality of the cocaine sample]?" and SERRANO replied "It's good, it's fucking good [quality]." A little later in the conversation SERRANO said "So, I wanted to...the truth is, this guy [ROSALIO] is really the one who lost the material [ROSALIO is who CW-3 actually has a drug debt with]." CW-3 asked "He's the owner [ROSALIO is the supplier of the cocaine that was stolen from CW-3]?"; and SERRANO replied "He's the owner." CW-3 said "The real owner. So then the other guy that... [ROMO, who had met with CW-3 at the Dunkin' Donuts on January 10, 2007]?" and SERRANO replied "He's his partner. He's [ROSALIO] the main guy." ROSALIO then said "Yes, the thing is, it's been while...with the money. I've been asking him what's going on with the money... As you know, it';s taken some time already." CW-3 said "Yes, I, I've been paying Rogelio, so the owner is you, the owner of the money that got lost, the two kilos [two kilograms of cocaine]." ROSALIO responded, "Yes, sir, that's me, yes, I'm the owner." CW-3 then asked ROSALIO his name and he replied "My name is Rosalio...or Chalio." CW-3 explained "In the summer a man that calls himself [INDIVIDUAL A] dropped two kilos from me [did not pay CW-3 for two kilograms of cocaine]. I told Rogelio. The guy [INDIVIDUAL A] paid me money, not all the money, he paid me 14,000 pesos [$14,000] in two installments. I told Rogelio about it." SERRANO acknowledged and CW-3 continued "Okay? For the two kilos. I pay Rogelio as I go, whenever I take one from him [CW-3 had been paying the debt by paying an extra $1,000 every time CW-3 purchased a kilogram of cocaine from Rogelio], you know this very well, Negro." SERRANO acknowledged and then CW-3 continued "Negro [SERRANO] knows it very well, 'cause I met Negro through Rogelio. I met the older gentleman [ROMO], we went and spoke to him and everything. Over there at the Dunkin' Donuts, remember [referring to the meeting at the Dunkin' Donuts on January 10, 2007, and supervised by the FBI]?" SERRANO again acknowledged and then CW-3 continued, "I pay

49

everything I lose, if I lose it [CW-3 pays for cocaine that CW-3 is responsible for]. I told Rogelio,

I'm a man enough. And keep buying [kilograms of cocaine] from Rogelio, I'm buying and buying,

and I always give him 1,000 pesos [$1,000 above the kilogram price toward his debt], okay? 'Cause

Mariano's problem. Mariano shitted on me, he brought me a bad kilo [LOPEZ supplied CW-3 with

low quality cocaine] , and so, he shitted on me, okay? Now, there were 7,000 pesos in the account

[CW-3 owed LOPEZ $7,000], plus the, 20 extra [over $20,000 owed for the two kilograms stolen

by INDIVIDUAL A], as I said to ah, the gentleman, the other gentleman [ROMO] and I told Negro

[SERRANO] the day we met at Dunkin' Donuts. And we agreed I was going to give him 5,000

pesos [$5,000] on Friday and El Negro came and I gave him 5,000 pesos [payment CW-3 made to

SERRANO on January12, 2007 and supervised by the FBI], is it true Negro or not?" SERRANO

replied "Yes. I reported it to the people." ROSALIO then said "Yes, they reported it to me." A little

later in the conversation, CW-3 said "So you see El Negro knows me very well already. How many

deals did you and I do together with Rogelio? Two so far, right [CW-3 conducted two cocaine

transactions with ROGELIO and SERRANO]?" SERRANO replied "Yes, with Rogelio, two." A

little later in the conversation CW-3 asked "At what price are you going to sell me the kilos

[kilograms of cocaine]?" and ROSALIO said "There's no problem, you can continue working with

him [CW-3 can continue to buy kilograms of cocaine from SERRANO]. There's no problem, it's

the same [it's the same cocaine whether CW-3 deals with ROGELIO or SERRANO]." CW-3 said

"But at what price? I need a good price so I can clarify the account with you [CW-3 is suggesting

that they sell him kilograms at a good price so he can continue to pay off his debt with them]." Do

you understand? I've told Rogelio many times, Rogelio, you're not the only guy who sells drugs over

here." SERRANO replied "It's true there's a lot of competition [other cocaine suppliers]." A little

later in the conversation ROSALIO said "You're going to be dealing with me from now on. In other words, you'll call me and I'll come over [ROSALIO will be responsible for collecting on the drug debt]. Ah, let me check the prices for that [cocaine], see what we come up with, him and I."

132.    At approximately 5:53 p.m., agents observed ROSALIO enter the passenger side of the Ford Expedition and depart the area. The Expedition was not followed. Although agents did not observe SERRANO enter the Expedition, it is believed that he entered the driver's side and departed with ROSALIO.

133.    At approximately 5:54 p.m., FBI agents met with CW-3, who walked the agents back into the workroom are of the garage. At that time, agents retrieved and seized the baggie containing the suspected cocaine from a workbench in the workroom. At approximately this same time, the CCTV recording equipment was deactivated. In addition, CW-3's cellular telephone was inspected, revealing an incoming call from telephone number (773) 837-7915 at approximately 5:52 p.m. CW-3 advised that this was the number that ROSALIO called CW-3 from at the end of the meeting.

134.    Prior to this first meeting and at approximately 4:36 p.m., CW-3 placed a consensually recorded telephone call to SILVA at telephone number (773) 701-8766. According to CW-3, SILVA told CW-3 that he already obtained the sample of cocaine. CW-3 explained to SILVA that CW-3 was waiting until a meeting with ROGELIO's people had concluded and at that time, CW-3 would be able to meet with SILVA. SILVA asked CW-3 not to tell ROGELIO that SILVA was going to be meeting with CW-3. In addition, a Spanish speaking linguist reviewed this call and determined that the recording was consistent with CW-3's account.

135.    At approximately 6:01 p.m., CW-3 placed another consensually recorded telephone call to SILVA at telephone number (773) 701-8766. According to CW-3, SILVA said that he would

51

be arriving in approximately twenty minutes, was bringing the sample of cocaine, but would not be

bringing the supplier. In addition, a Spanish speaking linguist reviewed this call and determined that

the recording was consistent with CW-3's account.

136.    At approximately 6:45 p.m., CW-3 received a call from SILVA who was using

telephone number (773) 701-8766. This call was recorded. During this call and according to CW-3,

SILVA told CW-3 that he was there. In addition, a Spanish speaking linguist reviewed this call and

determined that the recording was consistent with CW-3's account. At approximately this same time,

CW-3 was directed by agents to go to the garage to meet SILVA where the CCTV was already set

up to record audio and video.[31]

137.    A short time later, agents identified SILVA's green Chevrolet Monte Carlo parked

in the alley behind CW-3's residence.

138.    Agents monitoring the CCTV then observed CW-3 and SILVA enter the workroom

inside the garage. Agents observed and a subsequent review revealed, among other things, the

following: at approximately 6:48 p.m., CW-3 and SILVA walk into the workroom area of the garage;

SILVA hand CW-3 what appeared to be a small clear plastic bag; CW-3 inspect the sample of

cocaine; at approximately 6:55 p.m., SILVA receive a telephone call and have a conversation; and

CW-3 and SILVA exit the workroom area of the garage.

139.    A preliminary transcription of the recording revealed the following: shortly after the

meeting began CW-3 said "He [ROGELIO] was supposed to introduce me to the owner [of the

cocaine], and [UI] the owner and stuff...I said, I'm going to pay you up to the last penny [CW-3 will

repay ROGELIO for a past drug debt], I don't want to do any more business with you guys [buy

---

[31]Prior to, and after, meeting with SILVA, CW-3, CW-3's vehicle inside the garage, and the
garage were again searched for firearms and controlled substances with negative results.

cocaine from ROGELIO and his associates]." CW-3 then said "Is this stuff good [the sample of cocaine that SILVA provided to CW-3]?" and SILVA replied "Yes, it's good." CW-3 then said "This guy, you said he's good [supplier has good quality cocaine]. Do you know him for a long time?" SILVA responded "Yes, a long time. I know him and I know others [additional cocaine suppliers], but I'm working with him [buying cocaine from this supplier]." CW-3 asked "Okay, at what price?" and SILVA replied "At the same price we [SILVA and ROGELIO] were giving it to you." CW-3 asked "At $17,500?" and SILVA replied "$17,700." CW-3 said "No Shorty [SILVA], don't fuck with me. You told me $17,500." SILVA said "But the two [$200] is for me [SILVA's cut]. It's good. It's all good. You think that..." CW-3 smelled the sample that SILVA had provided and SILVA then said "Now when you order one [one kilogram of cocaine], you'll see it...see it and if you don't like it, I'll take it back." They discussed the new supplier a little more and then CW-3 asked "And ROGELIO doesn't know about this guy [the supplier]?" SILVA responded "No, ROGELIO doesn't know about him." CW-3 asked "This is a new line [new source of supply]?" And SILVA responded, "Neither Mariano [LOPEZ] or anyone else knows about him [the supplier]." A little later in the conversation, CW-3 asked "I want to ask you a question. You know, we've worked with ROGELIO for a while. Is ROGELIO the owner [of the cocaine]?" Silva responded "No." CW-3 asked "Or do they [Mexican suppliers] send it [cocaine] to ROGELIO?" and SILVA replied "They send it to ROGELIO." A little while later CW-3 said, "Cause ROGELIO sent me El Negro [SERRANO] and another older gentleman [ROSALIO were sent by ROGELIO to CW-3 to collect on the past drug debt]. He drives a red truck [ROSALIO]. Do you know him?" SILVA said "No, I don't." CW-3 continued "I don't know. I told him [ROGELIO], I'm gonna pay him his fucking money," and continued, "It could happen to anyone [getting robbed]. Do you remember what

happened to you [SILVA getting robbed once]? They [robbers] stopped you with two kilos [of cocaine], right?" SILVA responded "No, they tried to stop me, they tried to take two, it, from me [robbers attempted to steal two kilograms of cocaine from SILVA]." A little later in the conversation, CW-3 said "He said he had, him and El Negro [ROGELIO and SERRANO had cocaine available]. Do you know El Negro?" SILVA responded "Oh, El Negro? Yes." CW-3 said "Yes, El Negro said he had [SERRANO told CW-3 that there was cocaine available]." SILVA said "I know El Negro." and CW-3 said "Does El Negro get also [receive cocaine shipments]?" and SILVA replied "Yes, also." CW-3 asked "A lot?" and SILVA replied "More or less." CW-3 then said "He's [SERRANO] the one ROGELIO sent over here [to collect on the drug debt]." SILVA asked "Oh, you know el Negro?" and CW-3 responded "El Negro and that other dude, El Negro brought him. A guy by the name of, an older guy who's known as Joe [ROMO, referring to the meeting documented above which occurred on January 10, 2007]." SILVA said "Joe? Oh, I know who he is."

140.    At approximately 7:00 p.m., agents observed the garage door open and the Monte Carlo depart the area. The Monte Carlo was not followed.

141.    Moments later, CW-3 walked agents into the workroom area of the garage. At that time, agents retrieved and seized a clear plastic baggie containing a white substance, suspected to be cocaine, from a workbench in the workroom. At approximately this same time, the CCTV recording equipment was deactivated.

142.    On this same date, FBI agents transported both plastic bags containing the suspected cocaine to the FBI Chicago office where they were both field tested, yielding a positive response for the presence of cocaine. The suspected cocaine was sent to the DEA North Central Laboratory for

54

analysis which later confirmed that the substance received from SERRANO was 1.4 grams of cocaine and the substance received from SILVA was .5 grams of cocaine.

### H.    CW-3 Drug Debt Payment to ROSALIO on February 8, 2007

143.    On or about February 7, 2007, at approximately 7:05 p.m., CW-3 placed a consensually recorded telephone call to ROSALIO at telephone number (773) 837-7915. According to CW-3, during the call CW-3 asked ROSALIO what his name was, to which he replied "ROSALIO". CW-3 asked if ROSALIO would be able to meet at CW-3's residence the following day, so CW-3 could provide receipts, meaning money, to ROSALIO. They agreed to talk the following day. In addition, a Spanish speaking linguist reviewed this call and determined that the recording was consistent with CW-3's account.

144.    On or about February 8, 2007, at approximately 12:00 p.m., ROGELIO received a direct connect call on **Target Phone 3** from ROSALIO calling from direct connect IMSI 316010101896471, (Call Session 55). During this call, ROGELIO asked ROSALIO to "Tell me how much Cuba [CW-3] is going to give you." and continued by saying that if the amount was not satisfactory, "I am going to go with this guy and I will take all of the money from him."

145.    On February 8, 2007, at approximately 2:45 p.m., agents met with CW-3 and installed a CCTV camera inside the workroom in the detached garage of CW-3's residence where the transaction was expected to occur. The CCTV camera was set up to capture both audio and video surveillance of the transaction.

146.    On February 8, 2007, at approximately 2:54 p.m., agents established surveillance on the detached garage of CW-3's residence in anticipation of a meeting between ROSALIO and CW-3.

147.    At approximately 3:01 p.m., CW-3 placed a consensually recorded telephone call to

55

ROSALIO at telephone number (773) 837-7915. During this call and according to CW-3, ROSALIO told CW-3 that he would be at CW-3's residence in approximately twenty minutes.

148.    At approximately 3:19 p.m., ROSALIO, driving his red Ford Expedition, was observed in the vicinity of CW-3's residence. A couple of minutes later, the Expedition was observed parked in the alley behind the detached garage of CW-3's residence.

149.    At approximately 3:22 p.m., CW-3 received a call from ROSALIO who was using telephone number (773) 837-7915. During this call, ROSALIO told CW-3 that he was there. At approximately this same time, CW-3 was provided with $5,000 in United States currency contained in a white envelope and was directed by agents to go to the garage to meet ROSALIO.[32]

150.    Agents monitoring the CCTV then observed, among other things, the following: at approximately 3:24 p.m., CW-3 and ROSALIO enter the workroom area of the garage; CW-3 hand the white envelope containing the $5,000 to ROSALIO; ROSALIO take the envelope, open the envelope, and appear to count the money; ROSALIO put the envelope into an inside jacket pocket; and CW-3 and ROSALIO exit the workroom of the garage.

151.    At approximately 3:27 p.m., agents observed ROSALIO enter the Expedition and depart the area. Agents followed ROSALIO, ultimately, to his residence located at 581 Elsie Drive, Melrose Park, Illinois.

152.    At approximately 3:58 p.m., ROGELIO received a direct connect call on **Target Phone 3** from ROSALIO calling from direct connect IMSI 316010101896471, (Call Session 60). During this call, ROSALIO told ROGELIO that "I went to see the man [CW-3]. He gave me five

---

[32]Prior to, and after, meeting with ROSALIO, CW-3, CW-3's vehicle inside the garage, and the garage were searched for firearms, additional cash, and controlled substances with negative results.

pesos [$5,000]." ROGELIO asked "When did he say that he was going to give you the rest?" and ROSALIO responded "He didn't tell me, but he said that he is going to call me. Next time, I'll give you what he gives me." ROGELIO then asked if ROSALIO could loan him $1000 and ROSALIO said "Well yeah, from here [from the $5,000 he just received from CW-3]." They agreed to talk later.

**I.    Distribution of Heroin (ROGELIO, LOPEZ, AND URBINA)**

153.    On or about February 22, 2007, at approximately 10:07 a.m., ROGELIO received an incoming call on **Target Phone 3** from LOPEZ who was using telephone number (773) 282-7142 (Call Session 666). During this call, LOPEZ asked ROGELIO to talk to CW-3 because "I am here with a Chinese cousin [heroin] of mine" and continued by saying, "ask him [CW-3] if he will open up the restaurant with that waitress [sell heroin] and "see how much he [CW-3] will pay her per hour [price per quantity of heroin]." ROGELIO responded that "he [CW-3] will want to be introduced to her [CW-3 will want a sample]." LOPEZ continued "the girl is here with me and she wants to work and she has 8 to 10 friends [quantities of heroin]." Later in the call, LOPEZ told ROGELIO that he would "bring a picture of the girls [sample of heroin]."

154.    At approximately 6:23 p.m., ROGELIO received an incoming call on **Target Phone 3** from LOPEZ who was using telephone number (773) 282-7142, (Call Session 712). During this call, LOPEZ explained to ROGELIO that he had called Mexico and that "the family is here [narcotics shipment]"and they are going to work with us "in the factory [distributing narcotics]." LOPEZ suggested to ROGELIO that one of them could go to Arizona so that "one could be down there and one up here" and ROGELIO asked why one of them would have to go "down there [Arizona]." LOPEZ explained that it would not be right away but that he was asked to "find

57

someone that is good in accounting, so they won't cheat in the factory [someone who could be trusted with the narcotics and narcotics proceeds]." Later in the call, LOPEZ asked ROGELIO "should I take the girl's picture [sample of heroin] so they can see it" and asked if the person ROGELIO had spoken with was a "good worker [trustworthy]". ROGELIO said that the person is someone that "Shorty [SILVA]" has talked about and that "he works with Shorty [SILVA] and he can take two a week [possibly two quantities of heroin a week]" and that "he takes half of the cake [possibly half a kilogram of heroin]." ROGELIO also told LOPEZ that "a full one is six zero [$60,000 per kilogram of heroin]."

155.    On or about February 23, 2007, at approximately 11:26 a.m., ROGELIO received an incoming call on **Target Phone 3** from LOPEZ who was using telephone number (773) 282-7142, (Call Session 723). During this call, LOPEZ asked ROGELIO if he was going to "talk to that guy [narcotics customer] about the picture [sample of heroin]" and ROGELIO said that he had spoken to him and that "he wants to see it [the sample]." Later in the call, LOPEZ told ROGELIO that he was going to the house to "pick up the picture [sample]."

156.    On or about February 24, 2007, at approximately 12:20 p.m., ROGELIO placed an outgoing Direct Connect call using **Target Phone 3** to SILVA at Direct Connect number 183*696*7620, (Call Session 745). During this call, SILVA asked why ROGELIO had not called and why he had not given him [SILVA] the "picture [sample of heroin]" and ROGELIO responded that he had been waiting for SILVA's call. ROGELIO said that he would see about bringing "the picture [sample]" and SILVA told him to bring "it [sample] to me so I can bring it to him and the other guy [potential heroin customer]."

157.    At approximately 3:23 p.m., ROGELIO received a Direct Connect call on **Target**

58

**Phone 3** from SILVA who was using IMSI number 316010101885085, (Call Session 752). During this call, SILVA asked ROGELIO "is the factory open [are narcotics available]" and ROGELIO responded that it was but that he [ROGELIO] was waiting for "Papa Noa [URBINA]" and that he [ROGELIO] was going to borrow a pick up truck from him [URBINA] because "I can't move anything without the truck[33]." SILVA explained to ROGELIO that "he [SILVA's customer] wants four white [four quantities of cocaine]" and that "Gato [SERRANO] is giving me the round arounds since yesterday" and that "Gato [SERRANO] is lying and I'm lying to Guille [SILVA's customer]." ROGELIO told SILVA to wait a little bit and that "everything is already here [narcotics], but I need to pick up the truck to bring that [narcotics] here."

158.    On February 25, 2007, at approximately 4:39 p.m., ROGELIO received an incoming call on **Target Phone 3** from INDIVIDUAL G (Call Session 802). During this call, INDIVIDUAL G asked ROGELIO about "work [narcotics]" and ROGELIO told him that "maybe tomorrow or the next day we will have some here [narcotics available]." ROGELIO asked INDIVIDUAL G "What about Chinese food [heroin]? Is there someone who likes it [customers available]?" and INDIVIDUAL G responded "yes" and asked ROGELIO if they could meet to talk. ROGELIO said possibly later or tomorrow.

159.    On or about February 26, 2007, at approximately 10:23 a.m., ROGELIO received an incoming call on **Target Phone 3** from INDIVIDUAL G (Call Session 861). During this call, INDIVIDUAL G and ROGELIO made arrangements to meet at "the house that was Chalillo's [ROSALIO]" around 3:00 p.m.

---

[33] It is your Affiant's belief that ROGELIO wanted to borrow a vehicle containing a concealed compartment.

160.   At approximately 2:21 p.m., ROGELIO received an incoming call on **Target Phone 3** from INDIVIDUAL G (Call Session 880). During this call, INDIVIDUAL G explained that he was "near the Laramie and Schubert" picking up his child from school. INDIVIDUAL G and ROGELIO agreed to meet "by Jose's, Chalillo's [ROSALIO's] brother" in about twenty minutes.

161.   At approximately 2:54 p.m., ROGELIO received an incoming call on **Target Phone 3** from INDIVIDUAL G (Call Session 881). During this call, INDIVIDUAL G asked if ROGELIO had arrived and ROGELIO told him "in about three minutes." INDIVIDUAL G told ROGELIO that "I am also just arriving."

162.   At approximately 6:00 p.m., ROGELIO received a Direct Connect call on **Target Phone 3** from SILVA who was using IMSI number 316010101885085, (Call Session 900). During this call, SILVA said that "Guille [customer] called and he said that he needs the picture [sample] to get the frame [before making any purchases]" and ROGELIO told him that he [ROGELIO] was waiting on "the truck [the pick up truck with the concealed compartment]."

163.   On or about February 26, 2007, at approximately 6:45 p.m., ROGELIO received an incoming call **Target Phone 3** from URBINA who was using **Target Phone 1** (Call Sessions 904 and 3788, respectively). During this call, URBINA asked ROGELIO if "is it Chinese food [heroin] you are selling tomorrow?" and ROGELIO replied that it was. URBINA then commented that there were two kinds of food, "one is imitation and that is no good." and ROGELIO responded "No. It is original [good quality]". URBINA then asked "And what number does it have [what is the price]?" and ROGELIO said they would talk.

**J.     Attempted One Kilogram Cocaine Purchase on February 27, 2007 (ROGELIO, LOPEZ, URBINA, ROMO)**

164.   On February 27, 2007, at approximately 9:41 a.m., ROGELIO received a call on

**Target Phone 3** from ROMO calling from telephone number, (773) 419-5309, (Call Session 929). During this call, ROMO said "My old man is here. I need a red snapper [kilogram of cocaine], if you can." ROGELIO told ROMO that "I am going to see if I can locate a guy [a cocaine supplier]."

165.    At approximately 10:04 a.m., ROGELIO received a direct connect call on **Target Phone 3** from URBINA calling from direct connect IMSI 316010101970552, (Call Session 937). During this call, ROGELIO asked URBINA if he knew "the Texan guy...Papa [ROMO]?" URBINA responded that he did and then ROGELIO went on to explain that "He [ROMO] has a guy who is coming from five hours away," and that ROGELIO used to "Give some to that man [supply him with narcotics]." ROGELIO told URBINA that "He needs one right now. Do you have one [kilogram of cocaine]?" URBINA told ROGELIO "I only have a half [½ kilogram of cocaine]."

166.    At approximately 10:05 a.m., ROGELIO used **Target Phone 3** to place a direct connect call to URBINA at direct connect number 183*698*3689, (Call Session 938) and continued their discussion. ROGELIO explained who the customer was and URBINA agreed saying "Alright. Let me call this guy...El Chicano [supplier] to see what he says."

167.    At approximately 10:18 a.m., ROGELIO received a direct connect call on **Target Phone 3** from URBINA calling from direct connect IMSI 316010101970552, (Call Session 941). During this call, URBINA told ROGELIO that "That guy will give it to you, but at 17 [one kilogram of cocaine for $17,000]." and that the individual supplying the cocaine would "call me [URBINA] back when he arrives there, so he can give it to you [ROGELIO]." URBINA instructed ROGELIO to go to "Shorty's [SILVA]" neighborhood.

168.    At approximately 11:56 a.m., ROGELIO received a call on **Target Phone 3** from ROMO calling from telephone number (773) 307-2845, (Call Session 943). During this call, ROMO

61

told ROGELIO to call him on "this number." ROMO asked ROGELIO "Can it be done [can the cocaine transaction occur]?" and ROGELIO responded "I'm pretty sure" and that it would probably occur in the afternoon.

169.    At approximately 12:15 p.m., agents established surveillance at ROGELIO and LOPEZ's residence, located at 1043 North Drake Avenue, Chicago, Illinois. At approximately 12:40 p.m., ROGELIO exited the residence and entered a silver Chrysler Concorde. At approximately this same time, ROGELIO used **Target Phone 3** to call URBINA at **Target Phone 1**, (Call Sessions 947 and 3834, respectively). URBINA did not answer the call and ROGELIO did not leave a voice mail message.

170.    At approximately 12:44 p.m., ROGELIO received a call on **Target Phone 3** from URBINA calling from **Target Phone 1**, (Call Sessions 948 and 3836, respectively). During this call, URBINA told ROGELIO that he would arrive around "three [3:00 p.m.]" and wanted to know if ROGELIO had "the papers [money]." ROGELIO replied "Of course, the old Texano man that comes here all the time [ROMO]." and for URBINA not to worry because "We can close this deal very quick." ROGELIO also told URBINA that "The gentlemen has been the Texas men's customer for his entire life."

171.    At approximately 1:11 p.m., ROGELIO, who had been sitting in the Concorde, departed and was followed by agents. Agents followed ROGELIO to the neighborhood near 3353 North Kedvale Avenue, Chicago, Illinois, where he began to drive through alleys and in a circuitous manner. After briefly losing sight of the Concorde, agents re-observed ROGELIO sitting in the Concorde which was parked in front of 3353 North Kedvale Avenue. After a few minutes he departed the area and agents followed him to a MARSHALL's retail store located in a shopping plaza

at West Irving Park Road and North Kilpatrick Avenue. When ROGELIO exited the Concorde and walked towards the entrance of the Marshalls agents observed him to be looking around in all directions.

172.    At approximately 2:03 p.m. ROGELIO exited the Marshalls, entered the Concorde, and departed the area. He was again followed by agents. At approximately 2:09 p.m., he returned to the neighborhood near 3353 North Kedvale Avenue, Chicago, Illinois. He again drove through alleys and in a circuitous manner.

173.    At approximately 2:08 p.m., ROGELIO received a call on **Target Phone 3** from LOPEZ calling from (773) 282-8200, (Call Sessions 950). During this call, ROGELIO said "There has been another goddamned car behind me for awhile." and they went on to discuss that ROGELIO believed he had been followed. ROGELIO told LOPEZ "It's a Ford.." LOPEZ then asked "Are they uncles [law enforcement] are they Hispanic?" and ROGELIO responded that "They are aunts, but I don't know if they are cops." They continued to discuss it and then ROGELIO said, "Because I came to my cousin's, Chalillo's [ROSALIO], and it parked in front of me there."[34] ROGELIO explained further that "I acted stupid. I went to Marshalls and it was behind me... I left and it left behind me...I went to Chalillo's again, and it was behind me again." At the very end of the call, LOPEZ asked ROGELIO where he was and ROGELIO said "I'm on Pulaski and Belmont."[35]

174.    At 2:16 p.m, in response to the telephone call described in the previous paragraph,

---

[34] As stated in prior paragraphs, agents were following ROGELIO at this time and an agent driving a Ford was parked up the street from ROGELIO when he was sitting in front of 3353 North Kedvale Avenue. A public records search revealed that this is a prior address for ROSALIO SOBERANIS.

[35] This call was just over five minutes in duration and at approximately 2:13 p.m., agents re-observed the Concorde traveling south on North Pulaski Road approaching West Belmont Avenue.

surveillance of ROGELIO was terminated.

175.   At approximately 2:45 p.m., ROGELIO received a call on **Target Phone 3** from LOPEZ calling from (773) 282-8200[36], (Call Sessions 955). During this call, ROGELIO and LOPEZ again discussed how ROGELIO had been followed. LOPEZ then said "Be careful. I think it is Papa Noa's [URBINA] phone." and that "We have to be careful with those meetings and those invites." They then discussed having ROGELIO pick LOPEZ up at the hospital.

176.   At approximately 4:48 p.m., ROGELIO used **Target Phone 3** to place a direct connect call to URBINA at direct connect number 183*698*3689, (Call Session 961). During this call, ROGELIO asked how long will it be and URBINA replied that he was "waiting for Chicano to arrive."

177.   At approximately 4:48 p.m., ROGELIO used **Target Phone 3** to place a direct connect call to URBINA at direct connect number 183*698*3689, (Call Session 970). During this call, ROGELIO asked URBINA "So what am I going to tell the man [ROGELIO's customer, ROMO]?" URBINA told ROGELIO to meet him near SILVA's and that he had been waiting for "this shit head [supplier]" and would call ROGELIO when he was close by.

178.   At approximately 5:35 p.m., agents established surveillance at SILVA's residence in anticipation of a meeting between ROGELIO and URBINA.

179.   At approximately 5:37 p.m., ROGELIO received a direct connect call on **Target Phone 3** from URBINA calling from direct connect IMSI 316010101970552, (Call Session 978). During this call, ROGELIO asked URBINA if he was there and URBINA said he was a block away.

---

[36] Agents had followed LOPEZ, who walked to Norwegian American Hospital. Later ROGELIO attempted to call LOPEZ back at this number (Call Session 956) and the person who answered by saying Norwegian American Hospital.

64

180.    At approximately 5:40 p.m., ROGELIO used **Target Phone 3** to place a direct connect call to URBINA at direct connect number 183*698*3689, (Call Session 979). During this call, URBINA asked ROGELIO where he was and ROGELIO responded that he was "by Shorty's [SILVA] place. On Schubert."

181.    At approximately 5:41 p.m., agents, who had established surveillance at SILVA's residence, observed the Concorde park at the intersection of West Schubert Avenue and North Hamlin Avenue. After a short time, LOPEZ exited the Concorde and walked behind a tree nearby.

182.    At approximately 5:45 p.m., agents observed URBINA's grey Acura Legend with Illinois temporary license plate 939G016, arrived and parked out of view of agents across from the Concorde. After a few seconds, ROGELIO exited the Concorde and walked out of view in the vicinity of the Legend. At approximately 5:46 p.m., the Concorde, driven by LOPEZ, departed the area and was followed by agents. The Legend was no longer observed in the area.

183.    At approximately 5:58 p.m., ROGELIO received a call on **Target Phone 3** from ROMO calling from telephone number, (773) 307-2845, (Call Session 981). During this call, ROGELIO told ROMO that he was "here with a guy [URBINA], but the one [supplier] with that [cocaine] has not arrived."

184.    At approximately 6:08 p.m., ROGELIO received a call on **Target Phone 3** from ROMO calling from telephone number (773) 307-2845, (Call Session 983). During this call, ROGELIO said "This guy [URBINA] has half a fish [half a kilogram of cocaine]" and that it would take an hour to go get it from the house. ROMO responded that he "Wants a complete one [whole kilogram of cocaine]" and ROGELIO said "But that other guy [the supplier] has not arrived."

185.    At approximately 6:30 p.m., ROGELIO used **Target Phone 3** to call LOPEZ at

65

telephone number (708) 439-9547, (Call Session 988). During this call, ROGELIO asked LOPEZ

if he had seen "The friend [heroin supplier]" and LOPEZ responded that he had not arrived yet and

asked ROGELIO why he wanted to know. ROGELIO said that he [ROGELIO] wanted to know if

"He has a white shirt [kilogram of cocaine] somewhere." LOPEZ agreed to call him [the heroin

supplier].

186. At approximately 6:37 p.m., ROGELIO received a call on **Target Phone 3** from

LOPEZ calling from telephone number (708) 439-9547 (Call Session 989). During the call, LOPEZ

told ROGELIO that "The pretty, curly haired girls [narcotics, heroin or marijuana]" who LOPEZ

described as "Cousin... they just arrived at the hotel." LOPEZ then went on to say that "About the

car that the grandmother wants to go visit the family [the kilogram of cocaine ROGELIO had asked

about]", that they would let him [LOPEZ] know in five minutes.

187. For approximately the next hour, agents attempted to locate both the Legend and the

Concorde. At one point, the Legend was briefly observed and then lost in traffic.

188. At approximately 6:43 p.m., ROGELIO received a call on **Target Phone 3** from

LOPEZ calling from (708) 439-9547, (Call Sessions 990). During this call, LOPEZ told ROGELIO

to write down plates for a vehicle and went on to provide a license plate number and a vehicle

description.[37]   ROGELIO told LOPEZ "That is the one I told you about." and LOPEZ responded

"I don't know what up, but he is following the car." ROGELIO asked "Is it a dog [police]?" and

LOPEZ said "No, it is an ambassador [possibly Federal law enforcement]." LOPEZ also told

ROGELIO that "I parked and now I'm behind the mother fucker. He got away. He knows that I am

following him."

_____

[37] This vehicle was, in fact, following LOPEZ at the time, and was being driven by an agent.
The Concorde had been re-observed shortly before this time and agents had begun to follow it.

189.    At approximately this same time, the Concorde did, in fact, pull over and get behind the agent. The Concorde pursued the agent, following very closely and taking two or three turns with the agent. The agent, not wanting to reveal that he was law enforcement, drove in an evasive manner until the Concorde was no longer able to follow. At approximately 6:45 p.m., surveillance was terminated of the Concorde in response to the above intercepted call.

190.    At approximately 7:02 p.m., ROGELIO received a call on **Target Phone 3** from LOPEZ calling from (708) 439-9547, (Call Sessions 995). During this call, ROGELIO asked if LOPEZ "Did he call you [possibly referring to the narcotics supplier]?" and LOPEZ responded "No." ROGELIO then said "Alright, Just forget it." LOPEZ then went on to explain again about the vehicle which had been following him. LOPEZ told ROGELIO "We need to change the car...get rid of the car, leave it on the street." and ROGELIO agreed.

191.    On or about February 28, 2007, at approximately 8:39 a.m., ROGELIO received a direct connect call on **Target Phone 3** from ROSALIO calling from direct connect number 183*709*5661, (Call Session 1017). During this call, ROSALIO asked if ROGELIO had called him yesterday and ROGELIO said that he had. ROGELIO then went on to explain about being followed the day before and that he [ROGELIO] thought "It is someone sent by Gato [SERRANO] too, because I told him that I was going to have work [narcotics] and it [the vehicle] was following me since that day." ROGELIO continued by explaining that "Later I lent the car to Mariano [LOPEZ] and they followed him too." ROSALIO said "Give me the plate numbers to see who they are [possibly check the registration]" and ROGELIO continued that he and LOPEZ thought they had found the car and saw a woman driving it who fit the description of one of SERRANO's associates. ROSALIO instructed ROGELIO to confirm it is the same person and "If it is, we can do other

67

things."

### K.    Final Repayment of CW-3's Drug Debt on May 10, 2007 (ROGELIO)

192.    On or about May 8, 2007, at approximately 7:45 p.m., and after CW-3 left ROGELIO a voice mail message, CW-3 received a telephone call from ROGELIO who was using telephone number (773) 641-6518. This call was recorded. According to CW-3, among the things discussed, CW-3 told ROGELIO that CW-3 would have money ready before Friday.

193.    On or about May 10, 2007, at approximately 2:35 p.m., agents established surveillance on the detached garage of CW-3's residence in anticipation of a meeting between CW-3 and ROGELIO. Additionally, FBI agents installed a CCTV camera inside a workroom in the detached garage of CW-3's residence where the transaction was expected to occur and monitored this CCTV from inside the residence. The CCTV camera was set up to capture both audio and video surveillance of the transaction.

194.    On or about May 10, 2007, at approximately 2:49 p.m., and after CW-3 left a voicemail message for ROGELIO, CW-3 received a telephone call from ROGELIO who was using telephone number (773) 641-6518. This call was recorded. According to CW-3, ROGELIO was in Melrose Park and would arrive at CW-3's residence in about an hour and a half.

195.    At approximately 4:24 p.m., CW-3 received a telephone call from ROGELIO who was using telephone number (773) 641-6518. This call was recorded and according to CW-3, ROGELIO said was arriving at CW-3's residence. A few minutes earlier, CW-3 had been provided with $5,000 in United States Currency contained in a white envelope. CW-3 was directed by agents to go to the garage to meet ROGELIO.[38]

---

[38]Prior to, and after, meeting with ROGELIO, CW-3 and the garage were searched for firearms, additional cash, and controlled substances with negative results.

196.    At approximately 4:24 p.m., agents observed a dark colored Chevrolet Monte Carlo, Illinois license plate number 363-7629, and occupied by a driver and one passenger, park in the alley behind CW-3's residence.

197.    Agents monitoring the CCTV then observed CW-3 and ROGELIO enter the workroom inside the garage. Agents observed and a subsequent review revealed, among other things, the following: CW-3 hand the white envelope containing the $5,000 to ROGELIO; ROGELIO take the envelope, open the envelope, and appear to count the money; ROGELIO and CW-3 engage in conversation; and CW-3 and ROGELIO exit the workroom of the garage.

198.    A transcription of the recording revealed the following: shortly after the meeting began CW-3 asked ROGELIO "We'll square away from the two kilos that Paul [INDIVIDUAL A] stole from me. No? [CW-3 was referring to the two kilograms of cocaine referenced above]" and ROGELIO responded "Yes, yes, yes. There is no problem." CW-3 then asked "And that's all of the money I am paying those people. Where is it going? To you or to them?" and ROGELIO responded "To them. This is for them. For me!" A little while later CW-3 asked "When is the work [cocaine] going to arrive?" and ROGELIO responded "They [the suppliers] are telling me that this week, but I believe it is this week or next week." and that "The thing is that it is very expensive [the prices for kilograms of cocaine are high]." CW-3 asked "What price are you going to give it to me now?" and ROGELIO said that he was going to wait for someone else that had cheaper prices "Another gentleman is going to come this coming week. This gentleman is going to give it to me at 18 [another supplier will sell kilograms of cocaine for $18,000 per kilogram]." CW-3 then asked "What price are you going to charge me?" and ROGELIO responded "18 and a half [$18,500]. Do you know how much I got one [what he paid for a kilogram of cocaine] not long ago?" CW-3 asked how

69

much and ROGELIO replied "19, and a half [$19,500]." CW-3 asked what was going on and ROGELIO continued "I don't know what's going on. There isn't anything in Mexico. There isn't anything in all of Mexico [there is no cocaine available in Mexico]. And whatever they have goes right away. Quickly!" A little later in the conversation CW-3 asked "How much [cocaine] are you going to get?" and ROGELIO responded "I think something like... a lot, a lot." CW-3 asked "20, 30, 40 [kilograms of cocaine]?" and ROGELIO said "Something like that, more or less. You've seen how they do it. They give me 30 or 40 [kilograms] and then give someone else another 30, 40, just like that. They [suppliers] come by and pass it around [distribute the cocaine]." CW-3 said "That's fine." and ROGELIO replied "Right. They give me 40. They always give me 40. They give me 30 [kilograms of cocaine to distribute]." ROGELIO then explained that he moved to Melrose Park because he had a problem in Chicago with someone named "Negro", explaining that it was a different "Negro" than the one who had collected money from CW-3 [SERRANO]. ROGELIO explained "He wanted to fuck me. He was working [an informant] for the Feds [Federal law enforcement], and they ask me for 7 kilos [seven kilograms of cocaine]." CW-3 asked "And then what happened?" and ROGELIO continued "And I told him yes, that I was going to give it to him, but I went outside and a few guys looked weird to me. They were outside the house pretending to be fools; one with a little dog pretending to be a fool." ROGELIO said he observed these people to have radios and "And I saw a Fed's car [surveillance vehicle] right here on the block and I saw another one over there." CW-3 asked "don't you think they have you recorded if that guy is working for the Feds [an informant]?" and ROGELIO continued "No. The thing is that the guy was asking for it to a friend of mine [ROGELIO's friend was the one in contact with the informant]. My friend was not going to give it [the cocaine] to him unless I had said yes [authorized the transaction]." CW-

3 said "Then the deal was not done." and ROGELIO said "And I told my friend. You know what? Don't take anything [to the informant], I had noticed that [after ROGELIO saw what he believed to be law enforcement]. And just like that there were no problems [ROGELIO did not have any problems with law enforcement], but the Feds were going to fuck me with seven kilos [catch ROGELIO with the cocaine]." ROGELIO continued "And that guy had 50 kilos [kilograms of cocaine] stashed in his house and the deal did not take place. And I told my friend not to bring anything, because I had noticed what's going on [the presence of law enforcement]." ROGELIO then said "And that guy had 50 kilos stashed in his house. And they grab me and that guy [ROGELIO and his friend would have gotten arrested] and then they [law enforcement] go for the 50 kilos he had in his house."

199.    At approximately 4:46 p.m., agents observed ROGELIO and CW-3 exit CW-3's garage, speak briefly in the alley, and the ROGELIO enter the passenger side of the Monte Carlo, and leave the area. Agents followed the Monte Carlo to the vicinity of SILVA's residence and observed ROGELIO and an individual matching SILVA's description, exit the Monte Carlo and walk up an alley out of view. A few minutes later they appeared at the mouth of the alley and re-entered the Monte Carlo. Agents followed them for a short time before discontinuing surveillance at a cellular telephone store on North Milwaukee Avenue.

## V.  PROBABLE CAUSE FOR REQUESTED SEARCH WARRANT

200.    As set forth in this affidavit, I respectfully submit that the facts establish probable cause that the defendants did commit a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

201. This affidavit is also made for the purpose of establishing probable cause in support of

a warrant to search the premises known as 581 Elsie Drive, Melrose Park, Illinois (as further described below and in Attachment A to the Search Warrant Application) and to seize the records, documents, and items (as further described in Attachment B to the Search Warrant Application. The premises is the residence of ROSALIO SOBERANIS.

202.    As set forth in this affidavit, I believe the facts establish probable cause that the records, documents, and items (as further described in Attachment B to the Search Warrant Application) constitute fruits, instrumentalities and/or evidence of violations of Title 21, United States Code, Section 846 and Title 18, United States Code, Section and 2, and further that a search of the identified premises will result in the discovery of such records, documents, and items.

203.    As a result of my law enforcement experience and this investigation, I am familiar with the ways in which the members of the narcotics organization conduct their business, including, but not limited to, their methods of importing and distributing cocaine, their use of numerical codes and code words to conduct their transactions in secret, and their methods of laundering the proceeds of their cocaine trafficking.  Through my experience and my discussions with other experienced law enforcement officers, I am familiar with the methods, schemes, and operations used by major cocaine traffickers and know:

a.    That such illegal drug traffickers commonly place assets in names other than their own to avoid detection of these assets by government agencies;

b.    That even though those assets are in other person's names, the illegal drug traffickers continue to use those assets and exercise dominion and control over them;

c.    That illegal drug traffickers must maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing illegal drug trafficking business;

72

d.      That illegal drug traffickers maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of illegal drugs and that such documents may be in code. That traffickers commonly "front" illegal drugs (meaning they will provide illegal drugs to their customers on consignment and the customers will pay for it at a later date). That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the illegal drug traffickers have ready access to them, i.e., homes, offices, and automobiles;

e.      That it is common for illegal drug traffickers to secret contraband, proceeds of illegal drug sales, and records of illegal drug transactions, sources, and customers, in secure locations within their residences, offices, garages, storage buildings, safety deposit boxes, and other locations, including stash houses, for ready access, and also to conceal such items from law enforcement authorities;

f.      That persons involved in such trafficking conceal caches of illegal drugs, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal drug trafficking activities, in their residences, offices, garages, storage buildings, automobiles, and safety deposit boxes;

g.      That illegal drug traffickers commonly maintain addresses or telephone numbers in books, papers, pagers, or cellular phones (and often have multiple cellular phones and pagers) which reflect names, addresses, and/or telephone numbers for their associates in the trafficking organization, even if said items may be in code;

h.      That illegal drug traffickers sometimes store documents and records relating to their drug supplies, customers, money, and assets on computer hardware and software, the contents of which frequently yield evidence of trafficking and money laundering crimes;

i.      That courts have recognized that unexplained wealth is probative evidence of criminal activity in which transactions involving large amounts of cash and high profit margins are common, including trafficking in controlled substances;

**A.      581 Elsie Drive, Melrose Park, Illinois (residence of ROSALIO SOBERANIS)**

204.    The premises to be searched is the residence of ROSALIO SOBERANIS located at 581 Elsie Drive in Melrose Park, Illinois. The residence located at this address appears to be a single family split-level structure with a one car attached garage. It is located on the north side of the street in approximately the middle of the block. The address for the residence is displayed in gold numerals on a black plaque which is located on the front of the residence to the east of the door.

205.    As set forth above, on or about December 7, 2006, CW-3 purchased one kilogram of cocaine from ROGELIO and SERRANO. On this day, ROGELIO and SERRANO arrived in a white Lincoln Continental with Illinois license plate 849-1291. An NCIC inquiry revealed that this license plate was registered to ROSALIO SOBERANIS, 581 Elsie Drive, Melrose Park, Illinois. After the transaction, ROGELIO and SERRANO departed in the Continental and were followed by agents where it pulled into the garage behind the residence at 5141 West Montana Avenue, Chicago, Illinois, an address later determined to be SERRANO and ROGELIO's residence. After a short time, the Continental departed and was again followed by agents. The Continental was followed to 581 Elsie Drive, Melrose Park, Illinois. Due to the layout of the neighborhood, agents were unable to determine who, if anyone, entered this residence. A short time after that, the Continental departed

74

the residence and was followed by agents, and at that time, it was determined that SERRANO and two unknown women were in the Continental.

206.    On or about March 2, 2007, a white vehicle with Illinois license plate G33-9340, which appeared to be the Continental, was observed parked in the driveway of the residence. An NCIC inquiry later revealed that this license plate was registered to an individual at 1423 North Kedvale, Chicago, Illinois. A comparison of this registration and the registration for the Continental followed on December 7, 2007, revealed that the Vehicle Identification Numbers (VIN) were identical. In addition, on this same day, a red Ford Expedition with Illinois license plate 942-7552, registered to ROSARIO SOBERANIS, 581 Elsie Avenue, Melrose Park, Illinois, was parked in the driveway. As set forth above, this is the same vehicle observed by agents and driven by ROSALIO on January 25, 2007, and February 8, 2007, when ROSALIO met with CW-3 at CW-3's residence to collect money for CW-3's drug debt. In addition, on February 8, 2007, agents followed ROSALIO to his residence.

207.    On or about July 30, 2007, ROSALIO renewed his Illinois State Identification card and listed his residence to be 581 Elsie Drive, Melrose Park, Illinois, and public records checks have revealed that ROSALIO's current residence is listed to be 581 Elsie Drive, Melrose Park, Illinois.

208.    On or about February 27, 2008, ROSALIO was observed at the residence and operating a silver Chrysler Concorde bearing Illinois license plate 9427552. An NCIC inquiry later revealed that this license plate was registered to ROSALIO SOBERANIS, 581 Elsie Drive, Melrose Park, Illinois.

209.    On or about March 12, 2008, ROSALIO was observed entering the Concorde which was parked in the driveway at his residence at 581 Elsie Drive, Melrose Park, Illinois. Agents

75

followed ROSALIO and at approximately 4:46 p.m., observed ROSALIO, carrying a blue cannister with a silver end, enter Capri Auto Body, a business located on North Karlov Avenue, just south of North Milwaukee Avenue. At approximately 5:15 p.m., ROSALIO exited the business and re-entered the Concorde. Agents continued to follow ROSALIO and at approximately 5:43 p.m., ROSALIO parked on the 2200 block of North Lowell Street. ROSALIO opened the trunk of the Concorde and was observed rummaging around in the trunk. After a couple of minutes, ROSALIO tucked an object underneath his arm and walked to a residence where he appeared to wait at a side door. At approximately 6:13 p.m., ROSALIO returned to the Concorde where he was observed quickly placing an object in the trunk. Agents continued to follow ROSALIO in the Concorde and, at approximately 6:35 p.m., investigators with the Cook County Sheriff's Police, after observing a motor vehicle violation, conducted a traffic stop of the Concorde. During the stop, ROSALIO consented to a search of the vehicle. The search revealed an Ajax cannister with a false bottom which contained $1000 in United States currency. According to the agent who had observed ROSALIO entering Capri Auto Body with the blue cannister, this Ajax cannister appeared similar in shape, size and color. On or about March 13, 2008, agents secreted the cannister and currency in a room and used a trained narcotics K-9 to conduct a narcotics sniff of the room. The K-9 located the cannister and currency and indicated positively for narcotics.

210.    Additionally, on March 12, 2008, agents followed ROSALIO to the vicinity of SILVA's residence and at approximately 7:57 p.m., agents observed ROSALIO enter the gate and walk down the gangway for SILVA's residence.

**B. Search Protocol**

211.    The search shall be conducted pursuant to the following protocol: With respect to

the search of any computers or electronic storage devices seized from the location identified in Attachment A to the Search Warrant Application, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.    examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.    surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

d.    opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

e.    scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

f.    performing key word searches through all electronic storage areas to determine

77

whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

## CONCLUSION

212.    Based on the foregoing, I respectfully submit there is probable cause to believe the above-named defendants did conspire with each other and with others to possess with intent to distribute and to distribute a controlled substance, namely, in excess of five hundred grams of mixtures and substances containing cocaine, mixture and substances containing heroin, and marijuana, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

FURTHER AFFIANT SAYETH NOT.

Erika Gennuso
Special Agent, FBI

SUBSCRIBED AND SWORN TO BEFORE
ME THIS 24TH DAY OF MARCH 2008.

ARLANDER KEYS
MAGISTRATE JUDGE